# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| SHEENA RODRIGUEZ, <br> DANIEL ROGERS, <br> DOLORES CHACON, <br> ROGELIO CHAVIRA, AND <br> ELVIRA JOHNSON, <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT. OF HOMELAND SECURITY, <br> U.S. DEPARTMENT OF STATE, <br> U.S. DEPARTMENT OF JUSTICE, AND <br> U.S. DEPT. OF HEALTH AND HUMAN SERVICES <br><br><br><br><br><br> *Defendants*. | No. _____ |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Sheena Rodriguez, Daniel Rogers, Dolores Chacon, Rogelio Chavira, and Elvira Johnson bring this civil action against the above-listed Defendants for declaratory and injunctive relief. Plaintiffs allege as follows:

## INTRODUCTION

1.      Almost immediately after taking office, the Biden Administration took actions to open the Nation's borders and expedite the flow of non-citizens into the United States. Unlawful migration surged as a result. So, the Biden Administration began a series of shell games to camouflage the true extent of the unlawful migration and the attendant harm to the United States, its people, and the environment.

2.      The National Environmental Policy Act ("NEPA") is intended, in part, to prevent such

gamesmanship. The statute itself imposes no substantive outcome. Rather, NEPA is a procedural statute that obligates agencies to consider every significant environmental impact of a proposed action and to publicly document those impacts. NEPA thus facilitates informed decision-making by agencies and allows the political process to check those decisions. The procedural protections afforded to the American people by NEPA are in no way trivial simply because they are "merely" procedural. The Biden Administration skipped those procedural protections in order to massively expand the population of settled aliens in the United States as quickly as possible. Such population changes—and the attendant impacts to the environment—are precisely the sort of thing routinely analyzed under NEPA. The Biden Administration knew that by bypassing the required analysis and flooding local communities quickly, undoing these same actions would be tied up in endless legal process—leaving American citizens with little relief from the resulting harms.

3.      The analysis that NEPA requires also serves to inform agencies of potential violations of substantive environmental statutes, such as the Endangered Species Act ("ESA"). Unwilling to face the political fallout, the Biden Administration's solution was to simply forgo the inconvenient analyses required by NEPA. In one final action after another, federal agencies either failed to conduct any analysis at all, or—when confronted by commenters—invoked plainly inapplicable categorical exclusions. This suit challenges several of those actions as violations of NEPA and the Administrative Procedure Act ("APA"), including the termination of the Migrant Protection Protocols ("MPP"), adoption of the Asylum Interim Final Rule ("Asylum IFR"), implementation of various processes that are collectively known as CHNV, grants of Temporary Protected Status, and the awarding of large grants necessary to facilitate mass migration to the United States. And because some of those actions are likely to harm threatened and endangered species, this suit also asserts claims under the ESA.

## PARTIES

4.      Plaintiff Sheena Rodriguez is a resident of Euless, Tarrant County, Texas. Through

numerous trips to the border, she has witnessed the environmental degradation caused by the crisis of widescale illegal entry by foreign nationals. She has also experienced the impacts of population growth in the Dallas-Fort Worth area, including air pollution that is so severe that the area is designated a "non-attainment" area under the Clean Air Act. Mrs. Rodriguez has campaigned to get the Texas legislature to help control the problems arising from migration and population growth, and her efforts to do so were adversely impacted by the lack of information about the impacts of federal immigration activities. *See* Ex. A, Rodriguez Declaration.

5.      Plaintiff Daniel Rogers is a resident of Amarillo, Texas, which has received a large transient population due to the immigration policies of the Biden Administration. Amarillo is located on Interstate 40, a major thoroughfare of the trafficking of drugs and people coming north from the southern border. Certain neighborhoods in Amarillo also became hot spots for drug traffickers renting short term housing, creating an increase in homelessness in the area. This population increase has impacted Mr. Rogers, who works and owns property in downtown Amarillo. He has experienced significant environmental degradation to his properties because of the increase in the homeless population. In recent years, individuals who, on information and belief traveled from the southern border as a result of the Challenged Actions, began to sleep on the steps of his office building, and they have left trash, urinated, and defecated on his property. By 2024, the problem had become so persistent that Mr. Rogers had to build fences around his property. *See* Ex. B, Rogers Declaration.

6.      Plaintiff Dolores Chacon is a resident of El Paso, Texas. Her backyard is on the U.S.-Mexico border, and illegal migrants frequently cross her property. *See* Ex. C, Chacon Declaration.

7.      Plaintiff Rogelio Chavira is a resident of El Paso, Texas. He is married to Plaintiff Dolores Chacon, and he lives with her on the U.S.-Mexico border, where illegal migrants frequently cross his property. *See* Ex. D, Chavira Declaration.

8.      Plaintiff Elvira Johnson is a resident of Amarillo, Texas. A (legal) Mexican immigrant,

Ms. Johnson works as a translator for the local municipal courts and hospitals, which gives her greater awareness of trends in illegal immigration to Amarillo. After 2021, the number of illegal aliens rose quickly, both those passing through Amarillo and those who settled in the city. This increase in population has had a number of effects on Ms. Johnson personally. She deals with more traffic on the roads, more crowds when she shops, and she sees more trash and environmental degradation in her local community. The influx in population has required more investment in infrastructure, she has voted on two bond measures to build more schools because the local schools are no longer big enough. The open border has also led to an alarming increase in drug trafficking, and has exacerbated the fentanyl crisis in her community. Local hospitals, as Ms. Johnson is aware of as a translator, have seen a sharp increase in overdoses. *See* Ex. E, Johnson Declaration.

9.      Defendant U.S. Department of Homeland Security ("DHS") is an executive agency of the United States Government.

10.     Defendant U.S. Department of Justice ("DOJ") is an executive agency of the United States Government.

11.     Defendant U.S. Department of State ("DOS") is an executive agency of the United States Government.

12.     Defendant U.S. Department of Health and Human Services ("HHS") is an executive agency of the United States Government.

## JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under multiple federal statutes, such as the National Environmental Policy Act of 1969 (42 U.S.C. § 4321 *et seq.*) and the Endangered Species Act of 1973 (16 U.S.C. § 1531 *et seq.*). This Court also has subject-matter jurisdiction under 28 U.S.C. § 1346 and 16 U.S.C. § 1540.

14.     An actual controversy exists between the parties under 28 U.S.C. § 2201(a).

15.    This Court has authority to grant Plaintiffs' requested relief and other appropriate relief pursuant to 5 U.S.C. §§ 705-06 (the APA), 28 U.S.C. §§ 2201-02 (the Declaratory Judgment Act), and its inherent equitable powers.

16.    Because Plaintiffs are "seeking relief other than money damages," the government has waived sovereign immunity.  5 U.S.C. § 702; *see Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 198-99 (5th Cir. 2024).

17.    Venue is proper in the Northern District of Texas under 28 U.S.C. § 1391(e)(1) because Defendants are executive agencies of the United States Government, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and three Plaintiffs (Sheena Rodriguez, Daniel Rogers, and Elvira Johnson) reside in this District. Plaintiffs Daniel Rogers and Elvira Johnson also reside within the Amarillo Division of this District.

## LEGAL BACKGROUND

### THE NATIONAL ENVIRONMENTAL POLICY ACT OF 1969

18.    By the late 1960s, Congress was growing increasingly concerned with environmental degradation. But it recognized that industrial activity was not the only culprit. Government agencies, too, often acted with little concern for the environmental impact of their actions.

19.    A prime example is the Everglades. On one hand, the Interior Department and the National Park Service were seeking to acquire more land and protection for Everglades National Park. On the other hand, the Army Corps of Engineers and other federal agencies were busy with plans for dams and canals that might dry up the Everglades. Meanwhile, the Department of Transportation proposed building a "super jet airport" next to the Everglades, which would cut off even more water and fill the future park's airspace with noise. When Congress gathered the heads of the Army Corps of Engineers, the Interior, and Transportation departments together and asked them to explain what they were doing, "[i]t was obvious that they had little or no recognition that their programs were in

conflict with each other," according to Bill Van Ness, a then-special counsel to the Senate Committee on Interior and Insular Affairs.

20.     Congress responded with the National Environmental Policy Act of 1969, Pub. L. 91-190, 83 Stat. 852 ("NEPA") (codified as amended at 42 U.S.C. § 4321 *et seq.*).

21.     Congress made plain its purpose: "recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances," Congress declared,

> that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

42 U.S.C. 4331(a).

22.     Consistent with this overarching policy, Congress directed federal agencies to implement NEPA "to the fullest extent possible." 42 U.S.C. § 4332.

23.     "The sweeping policy goals announced in [§ 4331] are . . . realized through a set of 'action forcing' procedures that require that agencies take a 'hard look' at environmental consequences, and that provide for broad dissemination of relevant environmental information." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (citation omitted). "Although these procedures are almost certain to affect the agency's substantive decision, . . . NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Id.*

24.     The central "action-forcing" procedural requirement of NEPA is that federal agencies must provide "a detailed statement" assessing the environmental impacts of all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Under the

statute and in accordance with each agency's NEPA procedures, there are three levels of review that may apply in determining the environmental impact of a given agency action. At the highest level of review, an agency must produce a full Environmental Impact Statement ("EIS") for major federal actions that have potentially significant environmental impacts. The intermediate level of review, an Environmental Assessment ("EA"), is a "concise public document" that sets out analysis for determining whether to prepare an EIS. 42 U.S.C. 4336 (b)(2). If it is found that no EIS is required, the agency must issue a Finding of No Significant Impact ("FONSI") along with the EA. *Id.*

25.     The lowest level of review recognizes that not every federal action requires the preparation of an EIS or EA, "if the proposed agency actions is excluded pursuant to one of the agency's categorical exclusions, another agency's categorical exclusions, . . . or another provision of law." *Id.*

26.     Failure to perform an adequate analysis is actionable through the APA. *See, e.g.*, *Ondrusek v. U.S. Army Corps of Eng'rs*, 123 F.4th 720 (5th Cir. 2024).

THE ENDANGERED SPECIES ACT OF 1973

27.     As important as they were, the *procedural* requirements of NEPA were deemed insufficient to protect species from extinction. Accordingly, Congress enacted the Endangered Species Act of 1973, Pub. L. 93-205, 87 Stat. 884 (1973) ("ESA") (codified as amended at 16 U.S.C. § 1531 *et seq.*), to provide *substantive* protections for endangered and threatened species and their critical habitats.

28.     Congress found that "various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation." 16 U.S.C. § 1531(a)(1). "The plain intent of Congress in enacting [the ESA] was to halt and reverse [this] trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). Indeed, Congress broadly decreed "that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall

utilize their authorities in furtherance of the purposes of " the ESA. 16 U.S.C. § 1531(c)(1).

29.    Section 7(a)(2) of the ESA requires that "each federal agency shall, in consultation with and with the assistance of [the Fish & Wildlife Service and the National Marine Fisheries Service, collectively "the Services"], ensure that any action authorized, funded, or carried out by such agency (hereinafter . . . "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by [the Services] . . . to be critical . . . ." *Id.* § 1536(a)(2); 50 C.F.R. § 402.14.

30.    An agency must initiate consultation under Section 7 whenever its action "may affect" a listed species or critical habitat. 50 C.F.R. § 402.14(a). An agency is relieved of the obligation to consult only where the action will have "no effect" on listed species or designated critical habitat. *Id.* § 402.14(b)(1). "Effects determinations" are based on the direct and indirect effects of the proposed action when added to the environmental baseline and other interrelated and interdependent actions. *Id.* § 402.02 (definition of "effects of the action"). The scope of agency actions subject to consultation is broadly defined to encompass "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies . . . ." *Id.* (definition of "action"). An agency is required to "review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat." *Id.* § 402.14(a).

31.    Additionally, a federal agency must reinitiate consultation on agency actions over which the agency retains, or is authorized to exercise, discretionary involvement or control, under any of the following circumstances:

> (1) If the amount or extent of taking specified in the incidental take statement is exceeded; (2) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence; or (4) If a new species is listed or critical habitat designated that may be affected by the identified action.

*Id.* § 402.16(a).

32.     Federal agencies often use the NEPA process to comply with the requirements of the ESA. Accordingly, agencies that fail to comply with NEPA at any stage run the risk of failing to comply with the ESA as well.

33.     Violations of the ESA are actionable both under the ESA's citizen suit provisions and the APA. *Bennett v. Spear*, 520 U.S. 154, 175 (1997).

NEPA AND THE ESA REQUIRE ANALYSIS OF POPULATION GROWTH

34.     Analysis of whether a proposed federal action should be expected to induce population growth has been a routine part of NEPA analysis for all kinds of agency actions since the early days of NEPA. *See, e.g., City of Davis v. Coleman*, 521 F.2d 661, 675 (9th Cir. 1975). That's because population growth almost inherently results in adverse environmental impacts.

35.     Even relatively small population changes are routinely analyzed. For example, impacts to air quality, greenhouse gas emissions, local potable water supply, storm water management, traffic, noise, employment, housing, education, and wildlife were included in the Air Force's May 2024 EIS for the B-21 Raider bed-down, which will involve a net increase of only 1,318 individuals at Dyess Air Force Base if that alternative is selected, or a net increase of only 1,021 individuals at Whiteman Air Force Base if that alternative is selected. The B-21 bed-down EIS notably included a specific finding that no ESA-listed species or critical habitat will be impacted. *See* U.S. Department of the Air Force, *Final Environmental Impact Statement Volume One, B-21 Beddown Main Operating Base 2 (MOB) 2 or Main Operating Base 3 (MOB) 3 at Dyess AFB or Whiteman AFB, May 2024*, at 48, 58.

**FACTUAL ALLEGATIONS**

BIDEN ADMINISTRATION IMMIGRATION POLICIES

36.     During the Biden Administration, the construction of pipelines carrying oil were halted for environmental reasons, but pipelines carrying people from all over the world into the United

States were assembled and put into operation by the Defendant agencies. Indeed, immediately upon taking office, President Biden and his Administration acted to lift restrictions on entry to the United States.[1] Restrictions on issuing visas to citizens of hostile countries were proclaimed a "stain on our national conscience and . . . inconsistent with our long history of welcoming people." 86 Fed. Reg. 7,005 (Jan. 25, 2021). President Biden then halted construction of a wall along the southwest border of the U.S., declaring that his "administration is committed to ensuring that the United States has a comprehensive and humane immigration system," and "[i]t shall be the policy of my Administration that no more American taxpayer dollars shall be diverted to construct a border wall." 86 Fed. Reg. 7,225 (Jan. 27, 2021). He took that action despite Border Patrol officials' characterization of border wall infrastructure as a crucial "force multiplier" that allows the border patrol to control cross border traffic. *See*, Field Hearing Before the Committee on Homeland Security, "Failure By Design: Examining Secretary Mayorkas' Border Crisis," March 15, 2023, at https://www.congress.gov/118/chrg/CHRG-118hhrg52122/CHRG-118hhrg52122.pdf.

37. Current Commissioner of Customs and Border Protection ("CBP") Rodney Scott, who served as the Chief of the Border Patrol from January 2020 until August 2021, at the time that DHS implemented President Biden's comprehensive immigration expansion policy, offered sworn testimony that President Biden's policy ended a "bipartisan" border security strategy that had been in

---

[1] The four presidential directives that initially set in motion this overarching immigration policy were: 1) Presidential Proclamation 10142, January 20, 2021: Termination of Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction; 2) Executive Order 13993, January 20, 2021: Revision of Civil Immigration Enforcement Policies and Priorities; 3) Executive Order 14010 of February 2, 2021: Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border; and 4) Executive Order 14012 of February 2, 2021: Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans. *See* 86 Fed. Reg. 7225 (Jan. 27, 2021); 86 Fed. Reg. 7051 (Jan. 25, 2017); 86 Fed. Reg. 8267 (Feb. 2, 2021).

place for twenty-seven years. *See* Ex. F (Scott Trial Testimony) at 36:17–36:20. He explained that:

> Over my entire career, border security improved. Sometimes it improved fast; sometimes it improved slow, incrementally. But it was continually improving. But the effects of the executive orders issued on January—in January of 2021 by the Biden Administration, it reversed a 27-year proven strategy that Border Patrol had in place about deterrence, trying to prevent entry, and shifted the resources to processing people as quickly as possible against every border expert's advice. And it literally unsecured the border overnight.

*Id.* at 42:16-25.

38.     On another occasion, Mr. Scott has testified that the Biden Administration's consistent focus "was on expediting the flow of people into the United States." Ex. G (Scott Dep.) at 51:21–52:3. "Any focus on actually . . . weeding out fraud or minimizing the flow was off the table[,] and the conversation was just about speeding up the process." *Id.* at 53:9-11. If Border Patrol officials "brought up anything about the threats involved at the border, deterrents, [they] were not allowed to talk about deterrents, [and] there was no conversation[] allowed whatsoever about slowing down the flow." *Id.* at 61:3-16. So, although the Border Patrol officials "would brief out statistically what was going on [at] the border," "as soon as [those officials] started talking about any type of solutions or reducing the flow, the conversation was shut down and stymied." *Id.* at 81:10-13. Far from attempting to reduce migrant flow, the Border Patrol was "ordered . . . to redirect significant financial funding from enforcement operations . . . to bolster and beef up what the administration wanted to call welcoming centers" and avoid detaining migrants. *Id.* at 61:17-62:21.

39.     Not surprisingly, the flow of aliens across the U.S.-Mexican border quickly reached crisis levels, peaking at approximately 300,000 encounters per month, plus so-called "got-aways," before rapidly declining at the start of the second Trump Administration:



Graph obtained from Customs and Border Protection website.

40.    In a March 15, 2023 hearing before the House Committee on Homeland Security, then Border Patrol Chief Raul Ortiz was pressed about policies that would help with the border crisis. Chief Ortiz responded by reciting a litany of policies that the Biden Administration had repealed: "whatever consequences . . . you can call it Migrant Protection Protocols, you can call it Remain in Mexico, you can call it a Safe Third Country, all of the tools that the Border Patrol and DHS have at their disposal are going to allow us to do a better job of managing this border."

41.    The impact of the Biden Administration's open-border policy was predictable. When citizens of other countries perceive that immigration policy has become more favorable to them, they are more likely to cross U.S. borders illegally. Thus, for example, "any time people are released in the

United States after they were encountered by Border Patrol . . . when they arrived without documentation, there is always a significant increase in the illegal cross border [*sic*] of future people within that same group or class." Ex. G at 116:18–117:4. "[L]egal work or illegal work are both pull factors [too], but the ability to get legal employment or any type of legal document to move about the United States is a . . . very, very significant pull factor." *Id.* 122:13–123:5. The ability for an alien "to bring their [sic] children or their wife" is as well. *Id.* at 124:15–125:7. The ability to predict the impact of policies is so clear that Defendants have used it to support their administrative actions. *See, e.g.,* *Circumvention of Lawful Pathways*, 88 Fed. Reg. 11,704, 11,705-06 (Feb. 23, 2023).

42.    As one federal district judge vividly described, the Biden Administration's policies were "[c]ollectively . . . akin to posting a flashing 'Come In, We're Open' sign on the southern border." *Florida v. United States*, 660 F. Supp. 3d 1239 (N.D. Fla. 2023). "The unprecedented 'surge' of aliens that started arriving at the Southwest Border almost immediately after President Biden took office . . . was a predictable consequence of [the Administration's] actions." *Id.* The Court concluded:

> There were undoubtedly geopolitical and other factors that contributed to the surge of aliens at the Southwest Border, but [the Biden Administration's] position that the crisis at the border is not largely of their own making because of their more lenient detention policies is divorced from reality and belied by the evidence. Indeed, the more persuasive evidence establishes that [the Biden Administration] effectively incentivized what they call "irregular migration" that has been ongoing since early 2021 by establishing policies and practices that all-but-guaranteed that the vast majority of aliens arriving at the Southwest Border . . . would not be detained and would instead be quickly released into the country where they would be allowed to stay (often for five years or more) while their asylum claims were processed or their removal proceedings ran their course—assuming, of course, that the aliens do not simply abscond before even being placed in removal proceedings, as many thousands have done.

*Id.* at 1254-55.

43.    A few months later, DHS admitted it had undertaken multiple agency actions pursuant to a single, overarching policy: "the creation and expansion of lawful pathways through which

migrants can come to the United States." 88 Fed. Reg. 43,581 (July 10, 2023). DHS indicated that its Asylum IFR, 87 Fed. Reg. 18,078 (Mar. 29, 2022), the various "processes" collectively known as CHNV, *e.g.*, 87 Fed. Reg. 63,507 (Oct. 19, 2022), the restarted and expanded Central American Minors process, *e.g.*, 88 Fed. Reg. 21,694 (Apr. 11, 2023), expanded refugee processing, and expanded access to H-2 visas, were all part of that overarching policy. DHS further admitted that it had collaborated with DOJ and DOS for some of them. Pursuant to that same overarching policy, DHS then created a series of "Family Reunification Programs" to facilitate chain migration. *See, e.g.*, 88 Fed. Reg. 43,581 (July 10, 2023).

44.    While Plaintiffs challenge several discrete agency actions—such as the termination of MPP, adoption of the Asylum IFR, implementation of the CHNV programs, and grants of Temporary Protected Status—these actions were not isolated or incidental. They were all undertaken pursuant to a centralized, top-down policy adopted by the Biden Administration to expedite the flow of migrants into the United States. DHS itself has acknowledged this overarching directive, describing it as a coordinated effort to expand "lawful pathways" in collaboration with DOJ and DOS. As alleged throughout this Complaint, this coordinated campaign constitutes a unified policy of immigration expansion, implemented across agencies without the environmental review required by NEPA and the ESA. Plaintiffs therefore challenge not only the individual actions, but also the overarching policy they reflect—an apex policy that has triggered widespread, foreseeable environmental impacts that federal agencies failed to consider or disclose.

MASS IMMIGRATION IS FUNDED BY THE FEDERAL GOVERNMENT

45.    The Biden Administration did not merely lift restrictions on immigration and create policies inviting foreign nationals to enter, it also provided comprehensive funding for the mass migration pipeline, for both transport and settlement into the United States. This funding has allowed the building of a comprehensive resettlement infrastructure. The Federal funding falls into a few

different categories.

46.     Take the Refugee Admissions Program. Under this program, pursuant to which certain aliens can seek admission to the United States, subject to a cap set annually by the President. 8 U.S.C. 1157(a)(2), 1157(c)(1), 1181(c). On an annual basis, DOS provides funding to designated entities to support refugee application processing and to the International Organization for Migration ("IOM") to book travel to the United States. After arrival, DOS through its Bureau of Population and Migration ("PRM") provides funding through cooperative agreements to non-governmental organizations ("NGOs") to support their settlement. Upon information and belief, the cooperative agreements are entered annually or for a small number of years, with funds drawn down by the NGOs as services are performed. Further funding is provided to NGOs to support the aliens after they arrive through HHS and DHS. While the specific details of these arrangements are largely kept from the public, a number of the entities involved in building the resettlement "infrastructure" filed lawsuits to demand continued funding, and they revealed a number of details in doing so. *See Pacito v. Trump*, 25-cv-255, (W.D. Wash.) ("*Pacito*"); *United States Conference of Catholic Bishops v. Department of State*, 25-cv-465, (D.D.C) ("*USCCB*"); *Catholic Charities, Diocese of Fort Worth v. U.S. Department of Health and Human Services*, 25-cv-605, (D.D.C) ("*CCFW*").

47.     Two of the NGO participants in this scheme are HIAS, Inc and Church World Service ("CWS"). They have claimed in these complaints that they are majority-federal-government-funded nonprofit organizations partner with affiliates that form the backbone of the domestic infrastructure supporting refugee resettlement in this country. The funding statistics are astounding. HIAS's 2022 Form 990 indicates that of its $149,188,323 in revenue, $101,266,424 came from government grants, *i.e.*, 68%. CWS's website similarly states that of its $283,940,070 in funding, $251.404,699 was from U.S. government support, *i.e.*, 88.5%. CWS claims it has alone resettled 910,000 "refugees and parolees" in the U.S. And their local affiliates are equally dependent on government funds. The 2022

Form 990 of HIAS's affiliate in Texas—Endeavours—indicates that government grants provided $1,180,893,237 of its $1,187,899,206 total revenue, *i.e.*, 99.5%.

48.      According to HIAS and CWS, like other resettlement agencies that receive funding through cooperative agreements with DOS, they are "critical" to refugee resettlement, and they are unable to move refugees along through the mass migration pipeline without those federal funds. They further claim that refugees would have no ability to travel to the United States and seek admission without federal funding. And they further point to follow-to-join, a/k/a chain-migration (where an individual resettled in the United States is permitted to later bring in additional family members) as one of the efforts they support. The gist of HIAS and CWS's complaint in *Pacito* was captured by a single line: As a result of the Trump Administration's funding halt, "tens of thousands of refugees that the Plaintiff Organizations have as clients . . . had their plans to resettle or reunify with family blocked indefinitely."

49.      The largest of the NGOs building and maintaining this immigration infrastructure is the U.S. Conference of Catholic Bishops ("USCCB"). USCCB runs the largest non-governmental refugee-resettlement program in the United States. According to USCCB, it has provided refugee-resettlement services to more than 930,000 refugees, and it currently serves approximately 17% of refugees being resettled in the United States.

50.      USCCB has publicly stated that under USCCB's current cooperative agreements, PRM has committed to provide around $65 million in federal funding for the immediate physical needs and integration of refugees into their new communities. USCCB uses subrecipients to accomplish that task, including local Catholic Charities. It states that "it cannot sustain its programs without the millions in federal funding" that allow migrants to integrate into American communities, and that without that funding, many foreign nationals would not be settled into U.S. communities.

51.      For fiscal year 2025, USCCB entered into two cooperative agreements with DOS

awarding it around $65 million for the resettlement of foreign nationals, and the cooperative agreements run from October 1, 2024 to September 30, 2025. This funding allows USCCB to meet the foreign national at the airport, transport them to a home, and provide food and clothing for their immediate needs, and help them apply for government benefits.

52.    Other aspects of the federally-funded resettlement infrastructure are operated through states or local NGOs. Take Catholic Charities of Fort Worth ("CCFW") as an example. As of March 2025, CCFW claimed it provides coordination, compliance guidance, and data support, as well as direct support services, to over 100,000 individuals and families through the Refugee Resettlement Program. CCFW further claimed that it is responsible for coordinating the RRP across the state of Texas and partnering with a state network of contractors and sub-recipients. Like other parts of the migration infrastructure, CCFW is heavily supported by government grants. According to CCFW's 2023 Form 990, of its $282,131,159 in revenue, $270,953,075 was from government grants, *i.e.*, 96.0%. CCFW's refugee operations are active in the Dallas–Fort Worth–Arlington area; it claims that from 2020 to 2025 more than 4,500 refugees were resettled in Tarrant County alone.

53.    Catholic Charities Texas Panhandle ("CCTXP") similarly resettles refugees in and around Amarillo. CCTXP does so through a cooperative agreement with the U.S. Conference of Catholic Bishops and DOS. Like other parts of the resettlement infrastructure, CCTXP is heavily dependent on government funds, and it cannot undertake its resettlement activities without those funds. According to the Refugee Language Project, 606 refugees arrived in Amarillo in FY 2022, 568 in FY 2023, and 1196 in FY 2024, in comparison to less than 200 arrivals per year from FY 2018 through FY 2020. CCTXP has historically supported about 200 of those Amarillo refugees every year. Notably, the number of Amarillo refugees do not include migrants who move to Amarillo from other cities, including a large number of Cubans who were originally paroled elsewhere in the United States.

MASSACHUSETTS COALITION FOR IMMIGRATION REFORM

54.    Despite taking multiple actions, including providing funding, that predictably resulted in vast increases in the number of aliens entering and settling into the United States, Defendants steadfastly refused to subject those actions to the environmental impact analysis required by NEPA.

55.    Attacking that failure, the Massachusetts Coalition for Immigration Reform and six individual Plaintiffs filed a complaint alleging, *inter alia*, that DHS violated NEPA when it decided to halt construction on the border wall and decided to rescind the Migrant Protection Protocols.

56.    After a two-day trial, the court held that one of the plaintiffs—border-area rancher Steven Smith—had standing. *Mass. Coal. for Imm. Reform v. U.S. Dep't of Homeland Sec.*, No. 1:20-cv-3438, 752 F. Supp. 3d 13 2024 U.S. Dist. LEXIS 175303 (D.D.C. Sept. 27, 2024).

57.    Mr. Smith credibly testified that border "traffic picked up" as did "the rate of crime and the amount of trash" after President Biden took office. *Id.* at *8. During the first Trump Administration, Mr. Smith saw illegal aliens or evidence of their activity on his property "a couple times a month." *Id.* Now he sees illegal aliens or their detritus on an almost "daily basis." *Id.* The court recounted Mr. Smith's testimony about the environmental impact:

> Increased alien traffic directly affects Smith's ranching operations. He described in detail that trash deposits increased with "more traffic." In Smith's words: "Trash has increased dramatically in the last—easy to sum it up—in the last three years." He said this will "be a problem for years to come, because there's huge piles and piles of trash that's out there where there is no road." Because "there is no good access," Smith suggested that a helicopter would be required to "load it up and pack it out of there." But for a rancher, "that's just not reality." So, Smith worried, the trash deposits alone will leave "harmful effect[s] on our environment for years to come."
>
> For Smith, the trash problem goes beyond visual blight or environmental concerns. His cattle ingest the trash—a fact Smith knows because he sometimes "cut[s] them open" and finds plastic in their digestive systems. If the slaughterhouse "find[s] plastic in [a] cow's gut" during the production process, Smith "lose[s] a portion of the profits as a result." And although the slaughterhouse does not tell Smith "how old the trash was," Smith testified that he's noticed a sharp

uptick in the trash on his land "in the last three years."

*Id.* at *10.

58.    Based on that testimony, the court found "that most if not all of the trash ingested by Mr. Smith's cattle had been left by migrants in the last three years." *Id.* It concluded the rancher "suffered tangible harms that were caused by an influx of illegal immigrants," and "that DHS's decisions to cancel all border wall construction and terminate MPP substantially contributed to that influx in illegal immigration." *Id.* at *30. As the court put it: "[T]he evidence at trial showed that nexus consisted of three links: (1) DHS's decisions relaxed deterrents and consequences for illegal immigration; (2) migrants reacted predictably to these relaxed obstacles, leading to a sharp uptick in illegal immigration; and (3) the dramatic increase in illegal immigration harmed [the rancher]." *Id.* at *31.

59.    The court held that both the decision to halt construction on the border wall and the decision to rescind the MPP were "major Federal actions" under NEPA because their effects "may be major" and "are potentially subject to federal control and responsibility." *Id.* (quoting 42 U.S.C. § 4332(C) and 40 C.F.R. § 1508.18). It then held that neither decision falls within one of NEPA's exceptions. Thus, DHS was obligated "to perform a NEPA analysis" but "concededly failed to do so." *Id.* (citing 42 U.S.C. § 4332(C)). The Court concluded that "DHS promulgated its decisions 'without observance of procedure required by law,'" in violation of the APA. *Id.* (citing 5 U.S.C. § 706(2)(D)).

THE IMPACT OF IMMIGRATION ON THE ENVIRONMENT

60.    Immigration—including immigration fairly traceable to the Biden Administration's policies—heavily contributes to population growth in the United States. Indeed, according to Steven Camarota, the Director of Research for the Center for Immigration Studies, immigration accounted for about 57% of U.S. population growth between 1990 and 2017. And Census Bureau projections indicate that the U.S. population will be nearly 85 million larger in 2060 than it otherwise would be if

there were no new immigration.  According to the Congressional Budget Office, a net 10.3 million people immigrated to the U.S. in the four years between 2021 and 2024. As a result, the foreign-born population reached an all-time high of 16.2%, surpassing the previous record set in 1890.

61.     The analysis applies in Texas, perhaps more so. According to the Texas State Demographer, international migration accounted for a quarter of Texas's new residents between 2021 and 2022, and nearly 57% from 2023 to 2024.

62.     Whenever there is an increase in the human population in a given area, there is a corresponding environmental impact. All things being equal, the greater the population increase, the greater the environmental impact. For example, the additional individuals consume food and energy; they generate refuse and sewage; and in the United States, they typically use pollution-causing transportation.

63.     The per capita use of resources and per capita pollution by persons living in the United States is greater than for persons living in most other parts of the world. For example, the annual per capita carbon emissions for people living in the United States was approximately 15.52 tons in 2019. By contrast, the per capita carbon emissions for people living in El Salvador that same year was 1.11 tons, in Haiti was 0.32 tons, in Honduras was 1.08 tons, in Mexico was 3.67 tons, in Nicaragua was 0.92 tons, and in Venezuela was 3.36 tons.

64.     To offer a concrete example of how resources are used and depleted: homelessness is at crisis levels in the United States, with HUD reporting more than 770,000 people homeless on a single night in 2024, an 18% increase over the then-record high in 2023. According to HUD, multiple communities accounted for that increase by pointing to an influx of new arrivals by migrant and asylum-seeking families. In other words, the increase in aliens leaves more Americans homeless in the near-term, and it will inevitably increase the number of new homes—and their associated infrastructure—that will be built in the United States, with attendant negative impacts to the

environment.

65.     Federal officials have acknowledged those impacts, both implicitly and explicitly. For example, in FY2024, FEMA's Shelter and Services Program awarded tens of millions of dollars in grants to cities like Boston and New York to provide shelter to the flood of migrants spreading throughout the United States. According to the *Texas Tribune*, more than 90 recipients in Texas similarly received a total of more than $133 million Shelter and Services Program grants in FY2024. Among the recipients were chapters of Catholic Charities in Laredo, El Paso, and San Antonio, and local governments in El Paso, McAllen, Brownsville, San Antonio, Laredo and El Paso County. Recently, White House Deputy Chief of Staff, Stephen Miller, rhetorically asked what has illegal immigration "done to our schools, what has it done to our hospitals, what has it done to just traffic in our cities?" His answer: "Every issue that affects our quality of life—public safety, drugs, crime, education, health care, waiting in the emergency room—all [are] exacerbated, worsened, and undermined by mass illegal immigration."

66.     Illegal immigration also causes local impacts in border areas. Where there is widespread crossing by illegal aliens, the impact on the environment is severe, including increased litter, brush fires, buried detritus, and other environmental impacts caused by the influx of illegal immigrants. Indeed, the Arizona Department of Environmental Quality estimated that aliens crossing the border leave behind six to eight pounds of trash per person, per crossing, as highlighted by the ranking member of the House Committee on May 27, 2021.

67.     The environmental impacts of cross-border traffic also affect major throughfares in the interior. As the largest Texas city located on Interstate 40, Amarillo is part of a major throughfare for the trafficking of drugs and people who come from the border between Texas and Mexico. Because Interstate 40 is a major east-west thoroughfare across the entire country, traffic from the southern border flows from it to a multitude of destinations all over the United States, from St. Louis

to Chicago to Ft. Wayne to countless other American cities, towns, and communities. People who have brought drugs across the border illegally therefore frequently pass through Amarillo to bring their cargo to large cities all over the United States. Because Amarillo has available cheap housing north of Interstate 40, it is a hot spot for drug traffickers to rent short-term housing. Traffickers use these short-term rentals as stash houses to hide drugs or people on their way to other places in the United States. When members of drug cartels use houses in Amarillo this way, it further degrades the neighborhood. Neighbor infrastructure falls into disrepair, causing further environmental harms.

68.    The environmental impact is not limited to humans. Threatened and endangered species are adversely impacted, both by the direct impact of illegal border crossings, and by the indirect impacts of population growth on habitat. For example, the number of ocelots (*Leopardus pardalis*) in Texas has dwindled to critical levels, probably no more than 80 to 120 individuals, with approximately 30 to 35 live in the chaparral remaining at or near the Laguna Atascosa National Wildlife Refuge according to Texas Parks and Wildlife Department. Scattered but DNA confirmed sighting occur elsewhere however, according to media reports, leading to hopes that recovery efforts have improved the ocelot's chance of recovery and expansion. The ocelot was listed on the Endangered Species list in 1974 as a foreign species and extended into the U.S. portion of their range in 1982. A revised recovery plan was published for the ocelot in 2010 which called for "reduction of the effects of human population growth." 75 Fed. Reg. at 52547, 52548 (Aug. 26, 2010). Likewise, human disturbances and coastal development affect the green sea turtle (*chelonia mydas*) and loggerhead sea turtle (*caretta caretta*), which lay their nests on the coasts of Texas. Only four nests of the loggerhead sea turtle and thirteen nests of the green sea turtle have been confirmed on the Texas coast so far this year.

69.    Both the population growth in Texas caused by the challenged immigration actions and the disturbance to the natural environment caused by mass illegal border crossing leads to the loss and degradation of the nesting habitat in Texas of the loggerhead sea turtle, whose status on the

federal endangered species list demonstrates it is threatened in Texas.

70.    Both the population growth in Texas caused by the Biden immigration policy, and the disturbance to the natural environment caused by mass illegal border crossing leads to the loss and degradation of the nesting habitat in Texas of the green sea turtle, whose status on the federal endangered species list demonstrates it is threatened in Texas.

71.    Both the population growth in Texas caused by the challenged immigration actions and the disturbance to the natural environment caused by mass illegal border crossing leads to the loss and destruction of the habitat of the ocelot, whose status on the federal endangered species list demonstrates it is endangered in Texas. Habitat fragmentation and increased encounters with human activity such as traffic threaten the survival of the ocelot in Texas. Habitat fragmentation occurs when large, continuous habitats are divided into smaller, isolated patches due to urban development, agriculture, and infrastructure expansion, an inevitable result of immigration-induced population growth.

72.    Plaintiffs feel these impacts. Start at the border, with Plaintiff Dolores Chacon. She lives—and has lived for most of her life—in a historic home built by her great-grandparents. She takes great pride in this house, which has often been featured in magazines. Maintaining it in good repair and aesthetically pleasing condition requires consistent effort and investment. Her backyard borders the U.S.-Mexican line, and since the 1980s—when large numbers of unlawful border crossers began entering the U.S. with the intent to settle permanently—her quality of life has declined when the border is less secure. She lives on the front line and directly experiences the consequences of policies that increase unlawful border crossing. After the Secure Fence Act was passed in 2008, the federal government constructed a temporary fence in her backyard, which reduced the volume of illegal crossings from previously intolerable levels. However, the fence remains scalable by a wide variety of border crossers. She has long awaited the construction of a permanent, far more effective border wall.

In the absence of such a wall, illegal border crossers regularly climb the fence and traverse her property. They leave behind trash—diapers, backpacks, and dirty clothes—and frequently damage her home, including the roof, air-conditioning unit, and her personal property. Many of the individuals crossing suffer from illnesses contracted during the journey north, and she fears exposure to these health risks. She has even had to clean up blood left by border crossers who suffered injury in climbing the fence. Some hide drugs on her property, and she never feels safe from those who may be violent. The constant trespass—and the persistent threat of it—is deeply stressful.

73.    Environmental impacts from migration are felt away from the border as well, including by Plaintiff Sheena Rodriguez. The population growth resulting from the challenged immigration actions—and the Biden Administration's broader immigration-expansion policy—has caused Ms. Rodriguez numerous personal environmental harms. Rapid population growth in the Euless area has led to the construction of new infrastructure, including schools and high-density housing, in her neighborhood and throughout the areas where she lives her daily life. She now spends significant time stuck in traffic or rerouting around constant construction. The accelerated growth has also necessitated replacement of the region's water system, and construction of the new system has taken place on her own block, leaving the street torn apart. Upon information and belief, recent arrivals who migrated to the United States as a result of Biden Administration policies (her family members have even seen some of their immigration paperwork) have moved into her immediate neighborhood—on all sides of her home—and have transformed its aesthetic character. For example, Ms. Rodriguez is regularly exposed to loud music played at all hours, and the newcomers apparently raise exotic birds in their yard, which she does not believe are legal. She no longer feels that her family is safe, as large groups of men now occupy what were formerly single-family homes, and she observes a marked increase in illegal activity in the neighborhood, including drug use and drunk driving.

74.    Specific places that meant a great deal to Ms. Rodriguez—such as the small, beloved

baseball park where she used to take her son to practice—have been plowed over and destroyed to make way for infrastructure necessitated by population growth. Woodlands she used to enjoy while driving, including areas near the Dallas–Fort Worth airport, have been paved over to build new housing. She deeply misses the opportunities to enjoy nature that once formed part of her daily life. Specific places which meant a great deal to Ms. Rodriguez, such as the lovely little baseball park where she used to take her son to practice have been plowed over and destroyed to make way for the infrastructure made necessary by this population growth. Woodlands she used to pass while driving such as land around the Dallas Fort Worth airport have been paved over to build new housing. She greatly misses the opportunities to enjoy nature she used to have in her daily life.

75.    Ms. Rodriguez's community has grown substantially and now suffers from increased traffic congestion and resource depletion as a result of population growth, including growth driven by the challenged immigration policies. Under the Clean Air Act, her community is designated a non-attainment area for 8-hour ozone. As a result, she is required to undergo annual emissions testing for her vehicle. More importantly, Ms. Rodriguez is exposed to health-damaging air pollution. Her daughter suffers from asthma. According to the EPA, long-term exposure to ozone aggravates asthma and is likely to contribute to its development. Ms. Rodriguez has incurred medical expenses treating her daughter's condition, and it causes her ongoing concern for her child's health. Like most Americans, she desires clean, healthy air for herself and her family.

76.    Ms. Rodriguez regularly travels across Texas, including to the Texas–Mexico border, both to investigate the harms—environmental and otherwise—caused by mass border crossings and to visit her husband's family, some of whom reside on the Mexican side. Her travels frequently take her to south Texas, including the Rio Grande Valley, Laredo, Brownsville, and South Padre Island. As an avid birdwatcher and wildlife enthusiast, she enjoys observing native Texas fauna during these trips. She has been deeply disturbed by the environmental damage she has witnessed. For example, one of

her favorite birdwatching habitats has been overtaken by Catholic Charities facilities providing housing and services to border crossers.

77.     Whenever she travels, Ms. Rodriguez hopes to see endangered species native to Texas. On the occasions when she is fortunate enough to observe them, it is a moment of profound personal meaning. She has a heartfelt interest in seeing native Texas species restored to their natural habitat and derives a spiritual benefit from witnessing their recovery. For example, she found inspiration in the resurgence of the alligator, once depleted from its Texas range but now remarkably recovered. She holds a particular affection for the ocelot, an endangered cat she finds especially beautiful and hopes will similarly rebound. Once native to wide swaths of Texas, Louisiana, Arizona, and Arkansas, the ocelot is now found only in southern Texas. Ms. Rodriguez always hopes to see one when traveling through the Rio Grande Valley. She was overjoyed to spot an ocelot while driving between Laredo and the Del Rio Sector during a trip to investigate environmental damage from the Biden Administration's border policies. She derives aesthetic, spiritual, and recreational benefits from seeing these animals in the wild and continues to visit the region with hopes of seeing more.

78.     Ms. Rodriguez has also traveled with her family—including her homeschooled daughter—to South Padre Island to see Texas wildlife and endangered species. During these trips, they observed loggerhead and green sea turtles and derived aesthetic, spiritual, recreational, and educational benefits from the experience. Ms. Rodriguez plans to return to South Padre Island frequently with her family, as it is a place of special significance, cherished by loved ones who have since passed away and now treasured by her entire family.

79.     Ms. Rodriguez believes the environmental damage caused by mass migration threatens these species. She deeply values the aesthetic, ecological, recreational, and educational experiences she has gained through personal observation of Texas wildlife. She would be irreparably harmed if the critical habitats of these species were lost due to immigration-related actions and if these species

disappeared from Texas.

80.    As a result of Defendants' failure to conduct the analyses required by NEPA, there is at least a substantial risk that serious environmental impacts—including those described above—have been overlooked. Given the vast scale of migration caused by the challenged policies, there is a near-certainty that significant environmental impacts were ignored.

81.    On July 20, 2023, Plaintiffs served a notice letter, and on February 14, 2024, served an updated notice letter to Defendants DHS, DOS, DOJ, HHS, the U.S. Fish and Wildlife Service ("FWS"), and the National Marine Fisheries Service ("NMFS"). These letters advised that immigration-expanding policies threaten the continued existence of the green sea turtle, the loggerhead sea turtle, and the ocelot, and that Defendants are required to consult with FWS and NMFS under Section 7 of the ESA. Plaintiffs notified Defendants that the termination of the Migrant Protection Protocols (MPP), grants of Temporary Protected Status (TPS), parole programs—including those for nationals of Cuba, Haiti, Nicaragua, and Venezuela—the Asylum IFR, and the funding of migration through federal grants, triggered these consultation requirements.

## CLAIMS FOR RELIEF

### Count One
### Termination of Remain in Mexico / Migrant Protection Protocols
### Failure to Prepare an EA or EIS or Consult with Services
### NEPA, APA, and ESA

82.    Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

83.    In 2019, DHS adopted the Migrant Protection Protocols ("MPP" or "MPP 1.0") policy pursuant to 8 U.S.C. § 1225(b)(2)(C). Under 8 U.S.C. § 1225(b)(2)(C), noncitizens "arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States," may be returned to "that territory pending a proceeding under [8 U.S.C.] section 1229a . . . ." In short, MPP 1.0 provided for the return to Mexico of non-Mexican aliens who had been detained

attempting to enter the United States illegally from Mexico. MPP was designed to effectively end catch and release at the border with three other interlocking programs: Prompt Asylum Case Review ("PACR"), which allows DHS to quickly review the fear claims of other than Mexican nationals; the Humanitarian Asylum Review Program ("HARP"), which allows DHS to quickly review fear claims of Mexican nationals; and the Asylum Cooperative Agreements ("ACAs"), which allow DHS to send nationals to a third country to apply for asylum.

84.     On October 29, 2021, then DHS Secretary Alejandro Mayorkas issued memoranda terminating MPP 1.0 (the "October 29 Memoranda"). *See* Ex. I. "The October 29 Memoranda were. . . final agency action. . . ." *Biden v. Texas*, 597 U.S. 785, 808 (2022).

85.     In the October 29 memoranda, Secretary Mayorkas "recognize[d] that MPP likely contributed to reduced migratory flows" and further "presume[d] . . . that MPP resulted in a significant decrease in irregular border crossings and persons approaching the U.S. border to pursue non-meritorious asylum claims."

86.     Indeed, according to the Migration Policy Institute, during MPP 1.0's two-year lifespan in the first Trump Administration, from January 2019 to January 2021, approximately 68,000 migrants were enrolled and returned to Mexico. That obviously doesn't include the "significant decrease . . . in persons approaching the U.S. border to pursue non-meritorious asylum claims." The termination of MPP resulted in increased migration to the United States.

87.     The October 29 Memoranda are "major Federal actions" because their effects "may be major" and "are potentially subject to federal control and responsibility." The effects of the October 29 Memoranda may be major and they significantly affect the quality of the human environment. Upon information and belief, DHS did not perform the analysis required by NEPA or engage in ESA consultations before issuing the October 29 memoranda.

88.     Upon information and belief, the Biden Administration's DHS terminated MPP 1.0,

and the related Asylum Cooperative Agreements, Prompt Asylum Claim Review, and the Humanitarian Asylum Review Process, without performing the analysis required by NEPA and without consulting with the Services under Section 7 of the ESA.

89.     The termination of MPP was therefore a trigger for consultation under Section 7(a)(2) of the ESA. Defendants were required to initiate consultation to determine if the termination of MPP was likely to jeopardize the continued existence of the ocelot, green sea turtle, or loggerhead sea turtle. Defendants therefore violated, and will continue to violate, Section 7(a)(2) of the ESA. 16 U.S.C. § 1536(a)(2); 50 C.F.R. Part 402.

90.     The APA requires this Court to "hold unlawful and set aside" final agency action that is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "without observance of procedure required by law." 5 U.S.C. § 706(2). The termination of Remain in Mexico should therefore be set aside.

91.     Additionally and alternatively, the APA requires this Court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The Defendants should therefore be ordered undertake an appropriate NEPA review of the termination of Remain in Mexico.

### Count Two
### Asylum IFR
### Failure to Prepare an EA or EIS or Consult with Services,
### NEPA, APA, and ESA

92.     Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

93.     According to former Border Patrol Chief Rodney Scott, as part of the Biden Administration's focus on expediting the flow of people into the United States, the "idea of a rule change to give asylum officers [additional] authority . . . was coming up in meetings." Ex. G at 51:15–52:3. In a departure from ordinary practice, then-Chief Scott was not consulted on the proposed

asylum officer rule, but a senior Border Patrol official nevertheless advised the Biden Administration's political appointees in "no uncertain terms that [the proposed asylum officer rule] would increase cross border flow unless they factored in detention or remain outside the country." *Id.* 82:6–83:20.

94.    On March 29, 2022, DHS and DOJ published an Interim Final Rule, (the "Asylum IFR" or "Asylum Rule," 87 Fed. Reg. 18,163 (Mar. 29, 2022). The Asylum IFR profoundly changes the asylum procedures and standards in two significant ways. *First,* it broadened parole eligibility to any alien subject to expedited removal. 87 Fed. Reg. at 18,082, 18,108. *Second*, the Asylum IFR shifted discretion to USCIS asylum officers to summarily decide defensive asylum claims through non-adversarial "Asylum Merits Interviews" without the usual adversarial safeguards, and with only denials of asylum subject to review by an Immigration Judge. 87 Fed. Reg. at 18,082, 18,085, 18,089, 18,096; *see also Arizona v. Garland*, 730 F. Supp. 3d 258, 272 (W.D. La. 2024) ("[T]he Asylum IFR profoundly changes the asylum procedures and standards for those aliens otherwise subject to the Expedited Removal Statute, ending the decades-long protocol of considering asylum claims in adversarial proceedings before immigration judges and, instead, placing those determinations in the hands of agency civil servants in non-adversarial proceedings.").

95.    Consistent with Chief Scott's testimony, the predecessor NPRM and Asylum IFR both project net asylum grant increases. According to the NPRM, "the lowest number of credible fear cases received within the last five years was 79,842 in FY 2017, while the highest was 102,204 in FY 2019." 86 Fed. Reg. at 46,933. And the Asylum IFR then implicitly acknowledges the departure from the mean by projecting just three possible scenarios: annual asylum claims of 75,000, 150,000, or 300,000. 87 Fed. Reg. at 18,207. In other words, Defendants themselves believed it plausible that asylum claims could triple from pre-Rule annual highs.

96.    Nevertheless, in response to two comments focused primarily on population growth impacts, DHS and DOJ stated:

> Even assuming that such impacts are amenable to meaningful analysis in some contexts, any such analysis with respect to this rule would be fundamentally speculative in nature. This rule will not alter immigration eligibility criteria or result in an increase in the number of individuals who may be admitted or paroled into the United States.

> Rather, this rule changes specific procedures for adjudicating certain asylum claims pursuant to existing standards and shifts certain adjudicative responsibilities from DOJ to DHS. The commenters offered no basis to conclude that such changes would result in environmental impacts susceptible to meaningful analysis. This rule will not result in any major Federal action that will significantly affect the human environment and is not part of a larger action. As discussed in the NPRM and in the NEPA section below, the rule falls squarely within Categorical Exclusions A3(a) and A3(d) in *DHS Instruction Manual 023-01-001-01.*

87 Fed. Reg. 18,193.

97.    At least the claim that "[t]his rule will not result in any major Federal action that will significantly affect the quality of the human environment" was arbitrary and capricious. The statement that "[t]his rule . . . is not part of a larger action" was false.

98.    The Asylum Rule was a pull factor that increased migration to the United States.

99.    The Asylum Rule was therefore a trigger for consultation under Section 7(a)(2) of the ESA. Defendants were required to initiate consultation to determine if the Asylum Rule was likely to jeopardize the continued existence of the ocelot, green sea turtle, or loggerhead sea turtle. Defendants therefore violated, and will continue to violate, Section 7(a)(2) of the ESA. 16 U.S.C. § 1536(a)(2); 50 C.F.R. Part 402.

100.    The APA requires this Court to "hold unlawful and set aside" final agency action that is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "without observance of procedure required by law." 5 U.S.C. § 706(2). The Asylum IFR should therefore be held unlawful and set aside.

101.    Additionally and alternatively, the APA requires this Court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The Defendants should therefore be ordered undertake an appropriate NEPA review of the termination of the Asylum IFR.

**Count Three**
**CHNV**
**Failure to Prepare an EIS**
**NEPA and APA and ESA**

102.    Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

103.    In 2022, putatively in response to "increasing number of encounters of Venezuelan nationals along the southwest border," the Biden Administration's DHS created a "process" by which nationals of Venezuela could receive "advance authorization" to travel via air to the interior of the United States and seek parole. 87 Fed. Reg. 63,507 (Oct. 19, 2022). While paroled, participants could seek humanitarian relief or other benefits and receive work authorization. *Id.* at 63,508. The process also facilitated chain migration. Applicants were required to have a sponsoring "supporter" in the United States, but the supporter could be "a parolee or recipient of deferred action or deferred enforced departure." *Id.* at 63,515. The process was not subject to notice and comment.

104.    The Biden Administration's DHS created similar processes for Haitians, 88 Fed. Reg. 1,243 (Jan. 9, 2023), Nicaraguans, 88 Fed. Reg. 1,255 (Jan. 9, 2023), and Cubans, 88 Fed. Reg. 1,266 (Jan. 9, 2023). These processes for Cubans, Haitians, Nicaraguans, and Venezuelans are collectively known "CHNV," and DHS permitted issuance of up to 30,000 travel authorizations per month as part of CHNV. 88 Fed. Reg. 1,279 (Jan. 9, 2023). Parole was almost invariably granted to CHNV participants. Indeed, according to CBP, of 541,210 CHNV participants authorized to travel through November 2024, 531,608 arrived and were granted parole, *i.e.*, 98.2%.

105.    CHNV arrivals were concentrated. Summarizing documents received from DHS, House Homeland Security Committee Chairman Mark Green disclosed that between January-August 2023, the top eight airport locations used for the CHNV program and the number of inadmissible aliens who flew in were:

| | |
|---|---|
| Miami, FL | 91,821 |
| Ft. Lauderdale, FL | 60,461 |
| New York City, NY | 14,827 |
| Houston, TX | 7,923 |
| Orlando, FL | 6,043 |

| Los Angeles, CA | 3,271 |
| Tampa, FL | 3,237 |
| Dallas, TX | 2,256 |

106.    Upon information and belief, individuals paroled pursuant to CHNV reside in or around Dallas and Amarillo, Texas. Indeed, according to Catholic Charities Assistant Executive Director Samantha Moreno, more than 1,000 CHNV parolees resided in the Amarillo area as of April 2025.

107.    Each of the CHNV processes was a pull factor that increased migration to the United States. Each of the CHNV processes was a final agency action. Each of the CHNV processes was a "major Federal action" because their effects "may be major" and "are potentially subject to federal control and responsibility." The effects of the CHNV processes, individually and cumulatively, may be major and may significantly affect the quality of the human environment. Upon information and belief, no NEPA analysis was undertaken in connection with any of the CHNV processes, individually or cumulatively.

108.    The failure(s) to undertake a NEPA analysis in connection with any of the CHNV processes and/or in connection with the cumulative effects of the CHNV processes was a final agency action.

109.    The creation of the CHNV processes were therefore a trigger for consultation under Section 7(a)(2) of the ESA. Defendants were required to initiate consultation to determine if the CHNV processes were likely to jeopardize the continued existence of the ocelot, green sea turtle, or loggerhead sea turtle. Defendants therefore violated, and will continue to violate, Section 7(a)(2) of the ESA. 16 U.S.C. § 1536(a)(2); 50 C.F.R. Part 402.

110.    The APA requires this Court to "hold unlawful and set aside" final agency action that is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "without observance of procedure required by law." 5 U.S.C. § 706(2). The CHNV processes should therefore be held unlawful and set aside.

111.    Additionally and alternatively, the APA requires this Court to "compel agency action

unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The Defendants should therefore be ordered undertake an appropriate NEPA review of the CHNV processes.

**Count Four**
**H-1B Rule**
**Failure to Prepare an EIS**
**NEPA and APA**

112.    Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

113.    The APA requires this Court to "set aside" final agency action that is, *inter alia*, "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "without observance of procedure required by law." 5 U.S.C. § 706(2).

114.    The H-1B category allows U.S. employers to hire foreign workers into specialty occupation positions (i.e., those requiring specialized knowledge and a college degree). *See* 8 U.S.C. § 1182(a)(15)(H). An H-1B visa is nominally a temporary, non-immigrant visa lasting no more than six years. But foreigners who enter the United States on H1-B visas may become lawful permanent residents through the employment-based immigration system.

115.    Congress set the annual number of noncitizens who may be issued H–1B visas or otherwise provided H–1B status at 65,000, with an additional 20,000 H-1B visas available for non-citizens who have earned a master's degree or higher from a U.S. institution of higher education. *See* 8 U.S.C. § 1184(g). Since FY2000, the majority of H-1B workers have been exempted from these limits (known as the "cap") because they are extending their status or work for universities or nonprofit research or government research facilities that are exempt from the cap. Indeed, despite the cap, in FY2023 over 386,000 employer petitions for H-1B workers were approved, of which 69% were for continuing employment. One commentator estimated that–all told–there are as many as 730,000 H-1B holders within the U.S., and an additional 550,000 dependents (like spouses and children), *i.e.*, nearly 1.3 million aliens are tied to H-1B visas.

116.    On December 18, 2024, DHS promulgated a rule (the "H-1B Rule") that would increase the number of foreign nationals entering or remaining in the country through the H-1B, H-

2, H-3, F-1, L-1, O, P, Q-1, R-1, E-3, and TN non-immigrant classifications. 89 Fed. Reg. at 103,054. With respect to H-1B visas, it did so by extending the exemption from the "cap".

117.    H-1B visas are heavily weighted toward technical occupations. Not surprisingly, H-1B visa holders tend to be concentrated in areas where the technology industry has a significant presence. According to USCIS data, California and Texas have the most H-1B visa approvals, with Texas-based employers having sponsored over 55,000 approved H-1B visas in FY 2023. Older data compiled by Pew Research shows the College Station – Bryan area leading the nation with 31.8 H-1B approvals per 100 workers; the Dallas-Fort Worth-Arlington area ("DFW") having 2.1 H-1B visa approvals per 100 workers; and the San Jose – Sunnyvale – Santa Clara area ("Silicon Valley") having 2.2 H-1B visa approvals per 100 workers.

118.    Despite the large numbers of aliens involved, the expansion of the cap exemption, and the well-known concentration of H-1B visa holders in certain metropolitan areas, DHS responded to a comment noting that lack of a NEPA analysis by stating:

> [W]ith respect to the provisions being finalized through this final rule, the intended and expected impact of those provisions is not anticipated to significantly increase the number of foreign nationals in the United States. Rather, as discussed throughout this preamble, DHS is amending existing regulations to primarily modernize the H-1B program but is also including certain provisions that impact other nonimmigrant programs—H-2, H-3, F-1, L-1, O, P, Q-1, R-1, E-3, and TN. * * * * These amendments to existing regulations clearly fit within CATEX A3 because they are administrative in nature, do not have the potential to significantly affect the environment. are not a part of any larger Federal actions, and DHS is unaware of the existence of any extraordinary circumstances that create the potential for environmental effects.

89 Fed. Reg. at 103,194.

119.    The claim that "[t]hese amendments . . . are not a part of any larger Federal actions" was false. And the focus on "the number of foreign nationals in the United States" reflected the failure to scope an appropriate NEPA analysis given that H-1B visa recipients are concentrated in certain metropolitan areas. For example, one area in Texas with such a concentration is DFW, which has had population-related pollution problems for many years. Under the Clean Air Act, multiple counties in

the DFW area have been in non-attainment status for 8-hour ozone since at least 2018.

120. The H-1B Rule is a "major Federal action" because its effects "may be major" and "are potentially subject to federal control and responsibility." The effects of the H1-B Rule significantly affect the quality of the human environment. Upon information and belief, DHS nevertheless adopted the H-1B Rule without completing either an EIS or an EA under NEPA. DHS's obligations are not satisfied by its arbitrary and capricious citation of Categorical Exclusion A3, which purports to categorically exclude actions that are "administrative" or "procedural" in nature, an undefined term which could apply to any action taken by an agency.

121. The APA requires this Court to "hold unlawful and set aside" final agency action that is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "without observance of procedure required by law." 5 U.S.C. § 706(2). The H-1B Rule should therefore be held unlawful and set aside.

122. Additionally and alternatively, the APA requires this Court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The Defendants should therefore be ordered to consult with the Services and undertake an appropriate NEPA review of the H-1B Rule.

**Count Five**
**Temporary Protected Status**
**Failure to Prepare an EIS or Consult with Services**
**NEPA, APA, and ESA**

123. Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

124. Congress created Temporary Protected Status ("TPS") in 1990 as a form of humanitarian relief. *See* Immigration Act of 1990 § 302, 8 U.S.C. § 1254a. Under this statute, the Secretary of DHS may grant TPS to aliens who are nationals of designated countries and meet certain residential and registration requirements. *See id.* § 1254a(a)(1), (c). TPS recipients cannot be subjected

to removal proceedings, and they are authorized to work legally in the United States while their TPS continues. *See id.* § 1254a(a)(1).

125.    Although TPS was meant to be "temporary," it has not been so in practice. For example, Honduras and Nicaragua were first designated for TPS on January 5, 1999, and their designations have been extended ever since. El Salvador was first designated on March 9, 2001, and its TPS designation continues today.

126.    TPS encourages aliens to remain in the United States. Those aliens cause adverse environmental impacts in the United States.

127.    During the Biden Administration, DHS made numerous TPS designations, extensions, and "re-designations" that are still in effect. Examples of countries with a TPS designation include El Salvador (174,190 aliens granted TPS as of September 30, 2024), Haiti (260,790 aliens granted TPS), Honduras (52,585 aliens granted TPS), and Venezuela (505,400 aliens granted TPS). TPS recipients are concentrated in a small number of states. As of September 30, 2024, a total of 1,095,115 aliens reside in the United States pursuant to TPS designations, including 357,895 aliens in Florida, 124,710 aliens in Texas, 86,665 in New York, and 72,585 in California.[2]

128.    Each TPS designation was a pull factor that increased migration to the United States.

129.    TPS designations are "major Federal actions" because their effects "may be major" and "are potentially subject to federal control and responsibility." The effects of the TPS designations, individually and cumulatively, significantly affect the quality of the human environment. Upon information and belief, DHS made all TPS designations without completing either an EIS or an EA under NEPA and without consulting with the Services under Section 7 of the ESA.

130.    TPS designations are triggers for consultation under Section 7(a)(2) of the ESA.

---

[2] https://crsreports.congress.gov/product/pdf/RS/RS20844/79

Defendants were required to initiate consultation to determine if TPS designations are likely to jeopardize the continued existence of the ocelot, green sea turtle, or loggerhead sea turtle. Defendants therefore violated, and will continue to violate, Section 7(a)(2) of the ESA. 16 U.S.C. § 1536(a)(2); 50 C.F.R. Part 402.

131.    The restriction on judicial review in 8 U.S.C. § 1254a(b)(5) does not apply because it is limited "to individual decisions regarding the designation of a foreign country for TPS" and "does not bar review of general collateral challenges to [unlawful] practices and policies used by the agency in reaching those determinations." *Ramos v. Wolf*, 975 F.3d 872, 889 (9th Cir. 2020), *rehr'g en banc granted*, 59 F.4th 1010 (9th Cir. 2023), *and appeal dismissed*, 2023 U.S. App. LEXIS 16518 (9th Cir. June 29, 2023).

132.    The APA requires this Court to "set aside" final agency action that is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2). The TPS designations should therefore be set aside.

133.    Additionally and alternatively, the APA requires this Court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The Defendants should therefore be ordered undertake consultation with Services and an appropriate NEPA review of the TPS designations.

**Count Six**
**Grants**
**Failure to Prepare an EIS or Consult with Services**
**NEPA, APA, and ESA**

134.    Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

135.    "Examples of major federal actions [that are subject to NEPA] generally include . . . [p]roviding more than a minimal amount of financial assistance, including through grants, cooperative agreements, loans, loan guarantees, or other forms of financial assistance, where the agency has the

authority to deny in whole or in part the assistance due to environmental effects . . . ." 40 C.F.R. 1508.1;

*see also Indian River Cty v. Rogoff*, 201 F. Supp. 3d 1 (D.D.C. 2016); *Sierra Club v. U.S. Dep't of Agric.*, 777 F. Supp. 2d 44 (D.D.C. 2011).

136.    Federal grants and contract funds from HHS, and DOS have been used to create an infrastructure that supports illegal migration to the United States, including through HHS's Refugee and Entrant Assistance Program and DOS' Overseas Assistance Programs, and Overseas Refugee Support centers. For example, in GY2021, HHS awarded $6,914,577,915 in contracts for activities related to migration in Texas alone, primarily the provision of services to unaccompanied minors, including transportation and shelter. And between GY2021 and GY2024, HHS awarded over $771,000,000 in grants through refugee and entrant assistance programs for performance in Texas. This massive level of support for aliens acts as a pull-factor that increases migration. The funding enables foreign nationals abroad to make the journey into the United States and provides them with support once they arrive so that they can afford to stay. Without this support, the scale of the migration that occurred during the Biden years could never have been as massive as it was. The Biden Administration also established offices, known as Safe Mobility Offices, in countries like Guatemala, Costa Rica, Columbia, and Ecuador, to coordinate with this migration infrastructure.

137.    Between January 20, 2021, and January 20, 2025, DOS, through the Bureau of Population, Refugees, and Migration ("PRM"), published NOFOs that set out conditions for funding mass migration through NGOS. They include:

a)    February 12, 2024; DFOP0008371; Assistance listing number:19.517
b)    February 8, 2024; DFOP0005136; Assistance listing number: 19.517
c)    December 4, 2023; SFOP0010143; Assistance Listing number: 19.523
d)    November 27, 2023; SFOP0010137; Assistance Listing number 19.519
e)    April 28, 2023, SFOP0009717; Assistance Listings number: 19.522
f)    March, 30, 2023; SFOP0009616; Assistance Listings number: 19.522
g)    March 17, 2023; SFOP0009539; Assistance Listing numbers 19.511; 19.523
h)    March 15, 2023; SFOP0009490; Assistance Listings numbers19.517; 19.519
i)    February 7, 2023; SFOP0009405; Assistance Listing number: 19.517
j)    February 13, 2023; SFOP0009383; Assistance Listing number: 19.519

k) March 2, 2023; SFOP0009475; Assistance Listing number: 19.517
l) February 10, 2023; SFOP0009419; Assistance Listing number: 19.517
m) February 9, 2023;  SFOP0009412; Assistance Listing number: 19.518
n) February 7, 2023; SFOP0009371; Assistance Listing number: 19.517
o) January 31, 2023; SFOP0009369: Assistance Listing number: 19.519
p) November 16, 2022; SFOP0009257: Assistance Listing number: 19.519
q) May 2, 2022; SFOP0008932; Assistance Listings number: 19.018

138.    In the FY 2025 General NGO Guidelines for Overseas Assistance by PRM, DOS stated that "All PRM funded projects should integrate climate resilience and adaption into their project activities and consider their potential climate and environmental impacts."

139.    Between January 20, 2021 and January 20, 2025, HHS published NOFOs under Catalog of Domestic Federal Assistance ("CFDA") Number 93.576 (Refugee and Entrance Assistance) that set out conditions for funding mass migration through NGOs. They include:

a) March 17, 2021: the Refugee Family Child Care Microenterprise Program, HHS-2021-ACF-ORR-RG-1919.
b) March 17, 2021: the Refugee Career Pathways Program, HHS-2021-ACF-ORR-ZM-1920
c) April 8, 2021: the Refugee Microenterprise Development Program, HHS-2021-ACF-ORR-RP-1908
d) April 19, 2021: Preferred Communities Program, HHS-2021-ACF-ORR-RP-1908
e) April 19, 2021: Refugee Individual Development Accounts Program, HHS-2021-ACF-ORR-ZI-1910
f) April 25, 2022: the Refugee Agricultural Partnership Program, HHS-2022-ACF-ORR-ZR-0056
g) April 26, 2022: Refugee Family Child Care Microenterprise Development Program, HHS-2022-ACF-ORR-RG-0142
h) April 26, 2022: the Refugee Microenterprise Development Program, HHS-2022-ACF-ORR-RG-0053
i) April 28, 2022: the Employer Engagement Program, HHS-2022-ACF-ORR-ZN-0072.
j) April 28, 2022: the Ethnic Community Self-Help Program, HHS-2022-ACF-ORR-RE-0048
k) On May 13, 2022: the Refugee Career Pathways Program, HHS-2022-ACF-ORR-ZM-0156
l) On June 10, 2022: the Refugee Individual Development Accounts Program, HHS-2022-ACF-ORR-ZI-0158
m) On September 1, 2022: the Services to Afghan Survivors Impacted by Combat Program, HHS-2022-ACF-ORR-ZZ-0163
n) On March 8, 2023: Employer Engagement Program, HHS-2023-ACF-ORR-ZN-0018
o) On April 10, 2023: Ethnic Community Self-Help Program, HHS-2023-ACF-ORR-RE-0017
p) On April 25, 2023: Refugee Technical Assistance Program, HHS-2023-ACF-ORR-RB-0045

q) On May 5, 2023: ORR-ZI-0006    Refugee Individual Development Accounts Program, HHS-2023-ACF-ORR-ZI-0006

r) On May 17, 2023: the Ethnic Community Self-Help Program-Ukraine, HHS-2023-ACF-ORR-RE-0004.

s) On August 1, 2023: the Support for Trauma-Affected Refugees Program, HHS-2023-ACF-ORR-ZQ-0062.

t) On August 2, 2023: the Refugee Career Pathways Program, HHS-2024-ACF-ORR-ZM-0020

u) On August 3, 2023: Refugee Family Child Care Microenterprise Development Program, HHS-2024-ACF-ORR-RG-0023

v) On August 3, 2023: the Refugee Children and Youth Resilience Program, HHS-2024-ACF-ORR-RB-0137

w) On August 3, 2023: the National Refugee Lived Experience Council Program, HHS-2024-ACF-ORR-RB-0060

140.    Between January 20, 2021 and January 20, 2025, HHS published NOFO under Catalog of Domestic Federal Assistance ("CFDA") Number 93.598 (Services to Victims of a Severe Form of Trafficking) that set out conditions for funding mass migration through NGOS. They include:

a) April 27, 2022: the Trafficking Victim Assistance Program, HHS-2022-ACF-IOAS-OTIP-ZV-0150

b) May 16, 2022: the Victims of Human Trafficking Services and Outreach Program Pacific Region Demonstration Program (VHT-SO Pacific Program), HHS-2022-ACF-IOAS-OTIP-ZV-0038

c) May 22, 2022: the Lighthouse: Services, Outreach, and Awareness for Labor Trafficking (Lighthouse) Demonstration Program, HHS-2022-ACF-IOAS-OTIP-ZV-0059

d) Jun 10, 2022: the SOAR to Health and Wellness Training (SOAR) Demonstration Program, HHS-2022-ACF-IOAS-OTIP-ZV-0155

e) Jun 10, 2022: for the Aspire: Child Trafficking Victim Assistance Demonstration Program, HHS-2022-ACF-IOAS-OTIP-ZV-0000

141.    Each NOFO was a final agency action. They set out mandatory terms of the programs funded, and, upon information and belief, provide for the funding of programs until the end of fiscal year 2025 and are recurring in nature. These NOFOs provided for various grants which is not entirely determined by the NOFO itself, but the universe of grants awarded to be awarded pursuant to them is a closed universe.

142.    Pursuant to those NOFOs, various grants were awarded and programs run by these NGOs were approved. For example, Catholic Charities Diocese of Ft. Worth received funding

through the Office of Refugee Resettlement, which approved its program to resettle migrants in Texas in 2025 on January 14, 2025. The grants were disbursed from OMB Control No: 0970-0351, which has an expiration date of February 28, 2027. *See* Ex. H, *CCFW* Complaint, Exhibits A and B.

143.    Additionally and alternatively, each contract awarded under these grants was a final agency action.

144.    Additionally and alternatively, each disbursement of funds pursuant to those grants was (and for future disbursements, will be) a final agency action.

145.    Upon information and belief, no NEPA analysis was conducted for the NOFO, grants, or disbursements, individually or cumulatively. Each of the NOFOs, grants, and disbursements was a "major Federal action" because their effects "may be major" and "are potentially subject to federal control and responsibility." The effects of the NOFOs and the associated grants, individually and cumulatively, significantly affect the quality of the human environment.

146.    Each NOFO, grant, and disbursement was a pull factor that increased migration to the United States or, alternatively, directly financed migration to the United States.

147.    Each NOFO, grant, and disbursement are therefore a trigger for consultation under Section 7(a)(2) of the ESA. Defendants were required to initiate consultation to determine if these programs were likely to jeopardize the continued existence of the ocelot, green sea turtle, or loggerhead sea turtle. Defendants therefore violated, and will continue to violate, Section 7(a)(2) of the ESA. 16 U.S.C. § 1536(a)(2); 50 C.F.R. Part 402.

148.    The APA requires this Court to "set aside" final agency action that is, *inter alia*, "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "without observance of procedure required by law." 5 U.S.C. § 706(2). Accordingly, the grants should be set aside.

149.    Additionally and alternatively, the APA requires this Court to "compel agency action

unlawfully withheld or unreasonably delayed." 5 U.S.C § 706(1). The Defendants should therefore be ordered undertake an appropriate NEPA review of the grants.

**Count Seven**
**Across the Board Policy to Create and Expand Putatively Lawful Pathways**
**Failure to Prepare an EIS**
**NEPA and APA**

150.    Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

151.    Shortly after President Bident took office, Defendants adopted an overarching, across the board policy: "the creation and expansion of [putatively] lawful pathways through which migrants can come to the United States." 88 Fed. Reg. 43,581 (July 10, 2023).

152.    The adoption of that policy was a final agency action.

153.    Upon information and belief, Defendants did not engage in the required NEPA analysis before adopting that policy. That policy was a "major Federal action" because its effects "may be major" and "are potentially subject to federal control and responsibility." The effects of the policy and the subsequent related policies, individually and cumulatively, significantly affect the quality of the human environment.

154.    Upon information and belief, the adoption of this policy was a trigger for consultation under Section 7(a)(2) of the ESA. Defendants were required to initiate consultation to determine if their policy of creating and expanding pathways through which migrants can come to the United States was likely to jeopardize the continued existence of the ocelot, green sea turtle, or loggerhead sea turtle. Defendants therefore violated, and will continue to violate, Section 7(a)(2) of the ESA. 16 U.S.C. § 1536(a)(2); 50 C.F.R. Part 402.

155.    Additionally and alternatively, any NEPA analysis for each policy and final agency action pursuant to Defendants' overarching policy of creating and expanding putatively lawful pathways through which migrants can come to the United States was unlawfully segmented.

156.    The APA requires this Court to "set aside" final agency action that is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2).

157.    Additionally and alternatively, the APA requires this Court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C § 706(1). The Defendants should therefore be ordered undertake an appropriate NEPA review of the Biden Administration's across the board policy for "the creation and expansion of [putatively] lawful pathways through which migrants can come to the United States.

**Count Eight**
**Policy of Not Preparing an EIS for Actions that Increase Immigration**
**Failure to Prepare an EIS**
**NEPA and APA**

158.    Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

159.    Defendants have applied an underlying policy of performing no environmental analysis of actions that increase immigration despite NEPA's specific concern with population growth. Pursuant to that policy, NEPA issues are unaddressed or, if environmental issues are raised in comments, responded to by the assertion of inapplicable categorical exemptions. The adoption of that policy was a final agency action.

160.    That policy stands in sharp contrast to Defendants' NEPA analyses for relatively small construction projects. For example, DHS prepared an EA in 2021 when it proposed the demolition of four existing dormitory buildings and the construction of one new dormitory building at the El Paso Service Processing Center. That EA noted population and economic growth in El Paso, and addressed foreseeable projects by others in the vicinity, incremental impact to water quality, the impact of an increased number of detainees on utility systems, the impact to air quality including on El Paso's

44

non-attainment status under the Clean Air Act, adverse impacts to local transportation and traffic, and economic impacts.[3] Yet Defendants have scrupulously avoided performing a NEPA analysis on actions that foreseeably would—and did—result in tens of thousands or millions of migrants entering and residing in the United States, with attendant construction of houses, schools, etc., air and water pollution., and other environmental effects.

161.    DHS has stated in numerous past regulations that it will not apply NEPA to actions that increase immigration. For example, in DHS and DOJ's discussion of the application of NEPA in the Asylum IFR, the agencies stated that "Generally, the Departments believe that NEPA does not apply to a rule intended to change a discrete aspect of an immigration program because any attempt to analyze its potential impacts would be largely, if not completely, speculative." This statement is an admission that Defendants simply have decided that they will not attempt to comply with NEPA when it comes to immigration. The inference is that Defendants have underlying policies of either not performing a NEPA analysis for immigration-related actions or inappropriately relying on categorical exclusions to avoid the politically inconvenient discussion of the impact of their immigration-increasing actions at a level that is arbitrary and capricious.

162.    Further, when several proposals for related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976). Alternatively, an agency could approve one pending action that is fully covered by an impact statement, then take into consideration the environmental effects of that existing action when preparing the comprehensive statement on the cumulative impact of the remaining actions. *Id.* at 414 n.26.

---

[3] El Paso Service Processing Center Final Environmental Assessment

163.    The Biden Administration publicly characterized its border actions as a "broad, whole of government effort to reform our immigration system."[4]

164.    Because the immigration actions at issue in this case are interrelated and meant to work together to achieve a common goal, *i.e.*, to increase the population of foreign nationals settled in the United States, to try to isolate the environmental effects of each in isolation would be arbitrary and capricious. To comply with NEPA, Defendants were required to do either (i) a programmatic environmental impact statement that examined the reasonableness of all the actions at issue or (ii) individual assessments for each action at issue. That analysis must have considered the synergistic effects of all of the actions or included some combination of programmatic and individual impact statements. Defendants failed to perform that analysis.

165.    The APA requires this Court to "set aside" final agency action that is, *inter alia*, "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "without observance of procedure required by law." 5 U.S.C. § 706(2). Defendants' policy of not performing NEPA analyses for immigration-related actions should be set aside.

## Count Nine
### Policy of Not Consulting the Services for Actions that Increase Immigration
### Failure to Consult with Services
### ESA

166.    Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

167.    Plaintiffs have provided notice to Defendants that the environmental damage threatens the habitats of the federally endangered or threated species of the green sea turtle (*chelonia mydas*), the loggerhead sea turtle (*caretta caretta*), and the ocelot (*leopardus pardalis*), all of whose

---

[4]  https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/27/fact-sheet-the-biden-administration-blueprint-for-a-fair-orderly-and-humane-immigration-system/

continued existence in south Texas may be jeopardized and whose critical habitats may be threatened in south Texas by the crisis caused by Defendants' immigration-increasing actions.

168.    To comply with Section 7(a)(2) of the ESA, Defendants were required to do either (i) a programmatic consultation that considered the potential jeopardization of the endangered species by all the actions at issue or (ii) individual consultations for each action at issue. That consultation must have considered the synergistic effects of all of the actions or included some combination of programmatic and individual consultations. Defendants have repeatedly failed to perform that consultation and, upon information and belief, have a policy of not doing so for immigration-related agency actions.

169.    The APA requires this Court to "set aside" final agency action that is, *inter alia*, "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "without observance of procedure required by law." 5 U.S.C. § 706(2). The Court should set aside Defendants' policy of not consulting the services for actions that increase immigration.

## RELIEF REQUESTED

Plaintiffs pray for the following relief from the Court:

a.    declaratory judgment that the termination of MPP 1.0 and the October 29 Memoranda; the Asylum IFR; the CHNV processes; the H-1B Rule; all TPS designations or redesignations made during the Biden Administration; and all migration-supporting grants made by HHS, DHS, or DOS during the Biden Administration are substantively unlawful and violate the APA;

b.    an order vacating and setting aside the termination of MPP 1.0 and the October 29 Memoranda; the Asylum IFR; the CHNV processes; the H-1B Rule; all TPS designations or redesignations; and all migration-supporting grants made by HHS, DHS, or DOS;

c.      declaratory judgment that the across-the-board policies for the creation and expansion of putatively lawful pathways through which migrants can come to the United States, of not preparing an EIS for actions that increase immigration, and not consulting the Services for actions that increase immigration are substantively unlawful and violate the APA;

d.      an order vacating and setting aside the across-the-board policies for the creation and expansion of putatively lawful pathways through which migrants can come to the United States, of not preparing an EIS for actions that increase immigration, and not consulting the Services for actions that increase immigration are substantively unlawful

e.      a declaration that NEPA required and continues to require the Defendant agencies to consider the impact of immigration-expanding actions on the environment;

f.      an order that the Defendants prepare an Environmental Impact Statement over the Biden Administration's policy of expanding immigration, including each application of that policy;

g.      an order awarding Plaintiffs attorneys' fees and costs to the extent provided by law; and

h.      any further relief the Court may deem just and proper.

Respectfully Submitted.                     */s/ Jace R. Yarbrough*
                                            John C. Sullivan
                                            Texas Bar No. 24083920
                                            john.sullivan@slfirm.com
                                            Jace R. Yarbrough
                                            Texas Bar No. 24110560

jace.yarbrough@slfirm.com
**S | L LAW PLLC**
610 Uptown Blvd., Suite 2000
Cedar Hill, TX 75104
Phone: (469) 523-1351
Facsimile: (469) 613-0891

Julie B. Axelrod*
jba@cis.org
Colin M. Farnsworth*
cmf@cis.org
**Center for Immigration Studies**
1629 K Street, NW, Suite 600
Washington, DC 20006
Phone: (202) 466-8185

*Attorneys for Plaintiffs*

Joseph Scott St. John**
Louisiana Bar No. 36682
scott@stjohnlaw.com
**St. John LLC**
1701 Jefferson Avenue
New Orleans, LA 70115
Phone: (410) 212-3475

*Attorney for Plaintiff Sheena Rodriguez*

*Motion for Admission forthcoming

**Admitted to NDTX