IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| SHEENA RODRIGUEZ, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>Defendants. | 2:25-CV-163-Z |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants' Motion to Dismiss for Lack of Jurisdiction ("Motion"), filed November 28, 2025. ECF No. 27. Plaintiffs responded on December 26, 2025. ECF No. 31. Defendants replied on January 16, 2026. ECF No. 34. The Motion is now ripe. Having reviewed the Motion, briefing, and relevant law, the Motion is **GRANTED in part** and **DENIED in part**.

**BACKGROUND**

**I. The Original Complaint and Motion to Dismiss**

Plaintiffs filed their Original Complaint on July 21, 2025. ECF No. 1. Defendants filed a Motion to Dismiss the Original Complaint on September 26, 2025. ECF No. 16. Plaintiffs later filed an Amended Complaint. ECF No. 26.[1] Defendants filed a new Motion to Dismiss challenging the Amended Complaint. ECF No. 27. Accordingly, the original Motion to Dismiss (ECF No. 16) is **DENIED** as moot.

[1] The Amended Complaint adds one Plaintiff, Ann Vandersteel. ECF No. 26 at 4.

**II. The Amended Complaint**

Plaintiffs are individuals who claim Biden Administration immigration policies harm them. ECF No. 26 at 2–4. They say "the Biden Administration took actions to open the Nation's borders and expedite the flow of non-citizens into the United States," resulting in an increase in illegal immigration. *Id.* at 1. Plaintiffs claim both illegal border crossers and a general population increase cause them various harms, including increased traffic and air pollution in their communities, damage to their real and personal property, and dangers to protected animal species they visited in the past and plan to visit in the future. *Id.* at 2–4.

Plaintiffs allege the Government violated both the National Environmental Policy Act ("NEPA") and the Endangered Species Act ("ESA") when it enacted the challenged immigration policies. ECF No. 26 at 31–51. Both statutes require federal agencies to observe procedural safeguards when their actions could impact the environment.

NEPA requires government agencies to assess and disclose the expected environmental impacts of "'major Federal actions significantly affecting the quality of the human environment.'" *Id.* at 7 (quoting 42 U.S.C. § 4332(2)(C)). There are three levels of NEPA review; which level applies depends on the potential environmental impact of the agency action. *Id.* At the highest level, NEPA requires a full Environmental Impact Statement ("EIS") for federal actions that significantly impact the environment. *Id.* At the intermediate level, a more concise Environmental Assessment ("EA") suffices, if accompanied by a Finding of No Significant Impact ("FONSI"). *Id.* Finally, some agency action are excluded from preparation of an EIS or EA altogether "'if the proposed agency action[] is excluded pursuant to one of the agency's categorical exclusions, another agency's categorical exclusions, . . . or another provision of law.'" *Id.* (quoting 42 U.S.C. § 4336(b)(2)).

The ESA requires that "each federal agency shall, in consultation with and with the assistance of [the Fish & Wildlife Service and the National Marine Fisheries Service,

collectively 'the Services'], ensure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species . . . ." ECF No. 26 at 8 (quoting 16 U.S.C. § 1536(a)(2) and 50 C.F.R. § 402.14). An agency must consult with the Services if its action "may affect" a listed species. *Id.* (quoting 50 C.F.R. § 402.14(a)).

Plaintiffs allege the Biden Administration failed to prepare an EIS, as required by NEPA, and failed to conduct consultations, as required by the ESA, for several agency actions related to immigration. ECF No. 26 at 31–51. They seek a declaratory judgment, vacatur of the challenged actions and policies, and an injunction ordering the Defendants to "prepare an [EIS] over the Biden Administration's policy of expanding immigration, including each application of that policy." *Id.* at 51–52.

**III. The Motion to Dismiss**

Defendants filed a 12(b)(1) Motion to Dismiss challenging the Amended Complaint. ECF No. 27. They primarily challenge the individual Plaintiffs' standing to bring this lawsuit. ECF No. 27 at 8–22. They also argue this Court lacks jurisdiction over "broad programmatic challenges." *Id.* at 22–24. Finally, they assert Plaintiffs failed to comply with the ESA's pre-suit notice requirement. *Id.* at 24–25.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(1) provides that a defendant may seek dismissal of an action for "lack of subject-matter jurisdiction." FED. R. CIV. P. 12(b)(1). Federal courts have limited jurisdiction. They "possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. of Am.*, 511 U.S. 375, 377 (1994). Thus, a plaintiff "must make 'clear, distinct, and precise affirmative jurisdictional allegations'" in pleadings. *SXSW, L.L.C. v. Fed. Ins. Co.*, 83 F.4th

405, 407 (5th Cir. 2023) (quoting *Getty Oil Corp. v. Ins. Co. of N. Am.*, 841 F.2d 1254, 1259 (5th Cir. 1988)). A court must consider a jurisdictional challenge "before addressing any attack on the merits." *See In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012); *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). Under a 12(b)(1) motion, a court may dismiss for lack of subject-matter jurisdiction on any of three bases: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts in the records; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Clark v. Tarrant Cnty.*, 798 F.2d 736, 741 (5th Cir. 1986). The party claiming subject-matter jurisdiction bears the burden of proof to show it is there. *Mitchell v. Bailey*, 982 F.3d 937, 940 (5th Cir. 2020). The party bears the burden because courts "presume[] that a cause lies outside [their] limited jurisdiction." *Kokkonen*, 511 U.S. at 377.

## ANALYSIS

Plaintiffs' Amended Complaint includes nine counts. ECF No. 26 at 31–51. Each count alleges a different Biden Administration immigration program or policy violated NEPA and the ESA. *Id.* The Motion to Dismiss challenges this Court's jurisdiction to hear those counts on various grounds. *See* ECF No. 27.

The Court begins its analysis by considering whether Plaintiffs' challenges are overbroad. Next, for each Count that is not impermissibly broad, the Court considers its jurisdiction over policies reversed by the Trump Administration. Finally, for the remaining Counts, the Court considers whether at least one plaintiff has sufficiently pled Article III standing. The Court concludes it has jurisdiction for Counts One, Two, Four, Five (in part), and Six—the remaining Counts are dismissed.

**I. Reviewability of Broad Programmatic Challenges**

The Court begins by determining which of Plaintiffs' nine counts challenge judicially reviewable programs. *See NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 393 (5th Cir. 2015) ("Federal courts may analyze arguments that question our jurisdiction in any order."). Counts One through Six are reviewable, because they are challenges to final agency actions. Counts Seven, Eight, and Nine are not, so the Court lacks jurisdiction over those Counts.

*A. The Challenged Programs*

Counts One through Six challenge specific Biden Administration actions related to immigration: Termination of Migrant Protection Protocols (Count One); the "Asylum Rule" (Count Two); parole programs for nationals of Cuba, Haiti, Nicaragua, and Venezuela ("CHNV Parole Programs") (Count Three); a new H1-B Rule (Count Four); new Temporary Protected Status designations (Count Five); and the awarding of grants to groups who help fund "mass migration" (Count Six) (the actions challenged in Counts One through Six collectively, the "Challenged Actions"). ECF No. 26 at 31–46. Plaintiffs allege each Challenged Action was undertaken without performing the analysis required by NEPA or the consultation required by the ESA. *Id.*

Counts Seven, Eight, and Nine are different. Instead of challenging discrete agency actions, they challenge across-the-board policies. Count Seven challenges the failure to prepare an EIS under NEPA and conduct a consultation under the ESA in connection with President Biden's "overarching, across the board policy" of "the creation and expansion of [putatively] lawful pathways through which migrants can come to the United States." ECF No. 26 at 46–48 (quoting 88 Fed. Reg. 43,581 (July 10, 2023)). Counts Eight and Nine challenge the alleged policies of not preparing an EIS under NEPA (Count Eight) and not consulting under the ESA (Count Nine) in connection with immigration-increasing actions generally. ECF No. 26 at 48–51.

*B. Plaintiffs' Causes of Action*

To determine if Plaintiffs' challenges are reviewable, the Court must determine the cause of action for each alleged violation. All of Plaintiffs' counts allege substantive violations of NEPA and the ESA. ECF No. 26 at 31–51 (counts). Their challenges are actionable—if at all—only under the Administrative Procedure Act ("APA").

NEPA does not provide a private right of action. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990). But judicial review of alleged NEPA violations is available under the APA. *Id.* (citing 5 U.S.C. § 702).

Plaintiffs' ESA claims are actionable under the APA as well. Unlike NEPA, the ESA provides a private right of action via its "citizen suit" provision. 16 U.S.C. § 1540(g); *see also Bennett v. Spear*, 520 U.S. 154, 171–74 (1997). But for violations of Section 1536 (the only violations alleged here), citizen suits under the ESA are limited "to enjoin[ing] any person . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A); *see also Bennett*, 520 U.S. at 172–73. This language likely does not encompass Plaintiffs' failure-to-consult challenges, because failure to consult is not a continuing "violation" of the ESA. *See Bennett*, 520 U.S. at 174 (interpreting "violation" in Section 1540(g)(1)(A) narrowly); *see also Sierra Club v. Norton*, 74 F. App'x 376, 379 (5th Cir. 2003) (unpublished Fifth Circuit opinion relying on *Bennett* and finding failure-to-consult claims are not actionable under the ESA's citizen-suit provision). Thus, Plaintiffs' failure-to-consult claims cannot proceed as ESA citizen suits.

However, ESA claims can proceed under the APA. *See Bennett*, 520 U.S. at 175. Moreover, Plaintiffs *expressly* frame their ESA claims as arising under the APA. *See, e.g.*, ECF No. 26 at 51 ("The Court should *set aside* [under the APA] Defendants' policy of not consulting the services for actions that increase immigration." (emphasis added)).

Accordingly, the Court will analyze the ESA claims as actionable only under the APA for now, in addition to the NEPA claims.[2]

*C. APA's "Final Agency Action" Requirement*

When, as here, the substantive statute does not specifically authorize review, only a *final* agency action is reviewable under the APA. *Nat'l Wildlife Fed'n*, 497 U.S. at 882 (quoting 5 U.S.C. § 704 ("Agency action made reviewable by statute and *final* agency action for which there is no other adequate remedy in a court are subject to judicial review." (emphasis added))). Thus, the Court only has jurisdiction over Plaintiffs' claims to the extent they challenge a final agency action. The Fifth Circuit "views the lack of final agency action as a jurisdictional defect that bars judicial review, making Rule 12(b)(1) the proper vehicle for dismissal." *Kewayfati v. Bondi*, 165 F.4th 342, 355 (5th Cir. 2026).

An agency action must satisfy two conditions to be "final": (1) "the action must mark the consummation of the agency's decisionmaking process"; and (2) "the action must be one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78 (internal marks omitted). Counts Seven, Eight, and Nine do not challenge final agency actions, so this Court lacks jurisdiction over those Counts.

Start with Count Seven. Plaintiffs allege Defendants adopted an overarching policy: "the creation and expansion of [putatively] lawful pathways through which migrants can come to the United States." ECF No. 26 at 47 (citing 88 Fed. Reg. 43,581 (July 10, 2023)). It is doubtful whether this even counts as a "policy" in the sense Plaintiffs mean. The quoted statement comes from the background section of the announcement of a "family reunification parole process for Guatemalans." 88 Fed. Reg. 43,851 (July 10, 2023). But even assuming this

[2] Because the Court interprets Plaintiffs' claims as arising only under the APA, it does not reach Defendants' argument regarding Plaintiffs' alleged failure to comply with the ESA's pre-suit notice requirement. ECF No. 27 at 24–25. Pre-suit notice is required for ESA citizen suits, not APA challenges. *See* 16 U.S.C. § 1540(g)(2)(A)-(C).

is a "policy" sufficient to satisfy step 1 of the *Bennett* test, it fails at step 2. The policy statement—if it is one—is no more than a statement about what the agency intends to do: create and expand migration pathways. An agency's announcement about what it intends to do in the future is not a final agency action because it does not determine rights or obligations or produce any legal consequences. *Bennett*, 520 U.S. at 177–78. To the extent Plaintiffs mean to challenge other, similarly broad statements of agency intent, either written or unwritten, they fail for the same reason. This Court has no jurisdiction over Count Seven.

Counts Eight and Nine take a different approach. They challenge the Government's alleged "underlying policy" of not performing environmental analysis under NEPA (Count Eight) or consultations under the ESA (Count Nine) with regard to immigration-increasing actions. ECF No. 26 at 48–51. Essentially, they allege "violation of the law is rampant" in the Government's approach to increasing immigration. *Nat'l Wildlife Fed'n*, 497 U.S. at 891. But programmatic challenges seeking "wholesale improvement" of agency behavior by court decree are prohibited. *Id.*; *see also Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014). That is exactly what Plaintiffs seek in these Counts—wholesale improvement of the way Defendants approach environmental analysis when implementing immigration policy.

Plaintiffs argue there is "nothing novel" about their "across-the-board" claims, pointing to a successful challenge of the Biden Administration's "pause" of oil and gas leasing. ECF No. 31 at 15 (citing *Louisiana v. Biden*, 543 F. Supp. 3d 388, 413 (W.D. La. 2021)). But in that case, Plaintiffs challenged "specific things"—the cancellation of oil and gas leases. *Louisiana v. Biden*, 622 F. Supp. 3d 267, 286 (W.D. La. 2022). Here, Counts Seven, Eight, and Nine do not challenge specific things. They challenge (in Plaintiffs' words) an "across-the board" policy. ECF No. 31 at 15. Thus, the Court lacks jurisdiction over Counts Seven, Eight, and Nine.

The contrast with Plaintiffs' challenges in Counts One through Six demonstrates the difference. There, Plaintiffs challenge *specific* agency actions which they allege were required to and failed to conduct environmental analysis under NEPA and consultation under the ESA. Each of the Challenged Actions is a "discrete agency action." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Applying the two-step *Bennett* test, each (1) represents "the consummation of the agency's decisionmaking process" and (2) determines "rights or obligations" and produces "legal consequences." 520 U.S. at 177–78. Thus, the Challenged Actions in Counts One through Six are final agency actions, and the Court may review them under the APA. The Government barely challenges this conclusion. *See* ECF No. 27 at 22 ("Plaintiffs' entire case—but particularly Counts [Seven, Eight, and Nine]—amounts to an impermissible programmatic challenge."). And to the extent it does, its argument fails. Citing *Alabama-Coushatta Tribe of Texas*, 757 F.3d at 491, the Government argues that naming particular agency actions does not save a challenge from dismissal if the challenge, as a whole, is still directed at broad, unchallengeable polices. ECF No. 27 at 23–24. But in that case, the agency actions the plaintiffs identified were merely examples supporting their broad challenges, not separately challenged actions. *Alabama-Coushatta Tribe of Tex.*, 757 F.3d at 491 n.8. The Fifth Circuit did *not* hold that a plaintiff who brings broad, programmatic challenge is also barred from bringing otherwise proper challenges to final agency actions. *Id.* Here, the Court has rejected Plaintiffs' overly broad challenges. Their challenges to final agency actions in Counts One through Six may nonetheless proceed, to the extent they are otherwise proper.

In conclusion, the Court lacks jurisdiction over Counts Seven, Eight, and Nine. Plaintiffs claims are only actionable under the APA, and those Counts do not challenge final

agency actions as the APA requires.[3] But Counts One through Six challenge final agency actions, so the Court has jurisdiction to review them.

**II. Reviewability of Actions Terminated by the Trump Administration**

The Government argues some of the Challenged Actions were terminated by the Trump Administration before this case was filed. ECF No. 27 at 20–22. Specifically, they say the Trump Administration reimplemented MPP (Count One), terminated the CHNV Parole Programs (Count Three), and terminated TPS designations for Venezuela and Honduras (part of Count Five). *Id.*

Standing is assessed at the time a suit is filed. *See Davis v. FEC*, 554 U.S. 724, 734 (2008) (citing *Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)). Thus, the relevant question here is whether each Challenged Action was in force on July 21, 2025. ECF No. 1.

First, consider Plaintiffs' challenge to the termination of MPP (Count One). The Trump Administration reimplemented MPP at least by January 30, 2025. ECF No. 27 at 2. If Plaintiffs challenged the termination of MPP on January 31, they clearly would not have standing—the termination of MPP was not in effect. But when this litigation was filed on July 21, the reimplementation of MPP was subject to a nationwide stay. *See* ECF No. 31 at 3. A judicial stay "postpone[s] the effective date of an agency action." 5 U.S.C. § 705. So while the reimplementation of MPP was stayed, its *termination* was in effect. The question, then,

---

[3] In the alternative, even if the Plaintiffs' ESA claims in Counts Seven and Nine are actionable via an ESA citizen suit, the Court would still dismiss them as impermissibly broad. The ESA requires agencies to "insure that any action authorized, funded, or carried out by such agency" complies with the ESA. 16 U.S.C. § 1536(a)(2). Courts construe this definition of agency action "broadly," but still require consultations only when an agency takes an "affirmative" action. *See Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1021 (9th Cir. 2012) (listing as examples "the renewal of existing water contracts," "the creation of interim management strategies," and "the ongoing construction and operation of a federal dam."). The across-the-board policies challenged in Counts Seven and Nine are not the kind of "affirmative" actions challengeable under the ESA.

is as follows: Can Plaintiffs challenge the *termination* of MPP while its *reimplementation* is stayed?

The answer is yes. Certainly, a Plaintiff's standing cannot rest on speculation about harm from a future action. *See Barber v. Bryant*, 860 F.3d 345, 357 (5th Cir. 2017) ("An injury that is based on a speculative chain of possibilities does not confer Article III standing." (internal marks omitted)). But here, there is no speculation: the reimplementation of MPP was stayed when this case was filed, so the status quo—MPP's termination—was in effect. *See Nken v. Holder*, 556 U.S. 418, 429 (2009) ("A stay simply suspends . . . alteration of the status quo . . . ." (internal marks omitted)). It would be speculative to assume the stay in effect when this case was filed would be lifted. Because MPP's termination was in effect when this case was filed, Plaintiffs can challenge it.

Next, the Court considers Plaintiffs' challenge to the CHNV Parole Programs (Count Three). The Trump Administration terminated the CHNV Parole Programs at least by April 24, 2025. *See* ECF No. 27 at 3. Unlike the reinstatement of MPP, the termination of the CHNV Parole Programs was *not* stayed on July 21, 2025. *See* ECF No. 31 at 3. While one district court granted preliminary relief to an *individual* based on the termination being unlawful, it did not stay the terminations at large. *Id.* And it would be speculative to assume other courts would follow suit. *See Barber*, 860 F.3d at 357. Accordingly, Plaintiffs lack standing to challenge the CHNV Parole Programs in Count Three.[4]

Finally, the Court considers the challenge to the TPS designations for Venezuela and Honduras (Count Five). The Trump Administration terminated the TPS designation for *some*

---

[4] Plaintiffs request leave to file a supplemental complaint considering a stay entered *after* this litigation was filed. ECF No. 31 at 3. But it is not clear to the Court this would cure the jurisdictional issue in *this case*. *See Arena v. Graybar Elec. Co.*, 669 F.3d 214, 218 (5th Cir. 2012) ("Although 28 U.S.C. Section 1653 and Federal Rule of Civil Procedure 15(a) allow amendments to cure defective jurisdictional allegations, these rules do not permit the creation of jurisdiction when none existed at the time the original complaint was filed."). Accordingly, Plaintiffs' request is **DENIED**.

Venezuelans effective April 7, 2025. *See* ECF No. 27 at 3; ECF No. 31 at 4. But the termination of *other* Venezuelans' TPS designations, and TPS designations for all Hondurans, did not take effect until later, after this litigation was filed. ECF No. 31 at 4. Based on the principles discussed above, Plaintiffs have standing to challenge only those designations in place when this litigation was filed. Accordingly, Plaintiffs have standing to challenge the TPS designations in Count Five, except for those that were terminated when this suit was filed.

In summary, Plaintiffs lack standing to challenge the CHNV Parole Programs (Count Three) and the TPS designations that were terminated when this case was filed (part of Count Five).[5] However, if they sufficiently pled Article III standing, they may challenge the remainder of the Challenged Actions. The Court turns to Article III standing next.

**III. Article III Standing**

Federal courts are courts of limited jurisdiction. They "possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. of Am.*, 511 U.S. 375, 377 (1994).

Standing doctrine is core to a federal court's jurisdiction. The Constitution of the United States limits the jurisdiction of federal courts to "Cases" and "Controversies." Art. III, § 2; *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992). "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (internal marks omitted).

The "irreducible constitutional minimum of standing" requires a plaintiff to satisfy three requirements. *Lujan*, 504 U.S. 560. "[A] plaintiff must show (1) it has suffered an 'injury

[5] The Government did not allege mootness in its Motion to Dismiss. ECF No. 35 at 7 n.5. Thus, the Court does not consider mootness in this Order, and will address mootness via separate Order.

in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical" (the injury-in-fact requirement); "(2) the injury is fairly traceable to the challenged action of the defendant" (the causation requirement); and "(3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" (the redressability requirement). *Laidlaw*, 528 U.S. at 180–81 (citing *Lujan*, 504 U.S. at 560–61); *see also TransUnion*, 594 U.S. at 423. Put simply, a plaintiff must "claim to have suffered an injury that the defendant caused and the court can remedy." *TransUnion*, 594 U.S. at 423 (citation omitted).

Plaintiffs bear the burden to establish the three elements of standing. *See Daves v. Dall. Cnty., Tex.*, 22 F.4th 522, 542 (5th Cir. 2022). Each element must be supported "with the manner and degree of evidence required at the successive stages of the litigation." *Gen. Land Off. v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023) (ultimately quoting *Lujan*, 504 U.S. at 561). At the pleading stage, Plaintiffs must "clearly allege" facts sufficient to demonstrate each element of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)); *see also Gen. Land Off.*, 71 F.4th at 272 ("At the pleading stage, 'general factual allegations of injury resulting from the defendant's conduct may suffice . . . .'" (quoting *Lujan*, 504 U.S. at 561)).

Standing is assessed at the time a suit is filed. *See Davis*, 554 U.S. at 734 (citing *Laidlaw*, 528 U.S. at 180). "[A] plaintiff must demonstrate standing for each claim he seeks to press" and "for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (internal marks omitted). When there are multiple plaintiffs, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. F. for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006).

The Government asserts Plaintiffs failed to "plausibly allege standing." ECF No. 27 at 9. But Plaintiffs Dolores Chacon ("Chacon") and Rogelio Chavira ("Chavira) (Chacon and Chavira collectively, the "Border Plaintiffs") alleged facts to support their standing as to the remaining NEPA claims. And Plaintiff Sheena Rodriguez ("Rodriguez") alleged facts to support her standing as to the remaining ESA claims. Thus, at least for now, the Court has jurisdiction to hear these claims and the case may proceed.

*A. Injury in Fact*

The injury-in-fact requirement presents unique challenges when plaintiffs assert environmental claims. To start, injuries to non-economic environmental interests, including "aesthetic, conservational, and recreational" interests, can amount to an injury in fact. *See Sierra Club v. Morton*, 405 U.S. 727, 734, 738 (1972) ("We do not question that this type of harm [destruction of scenery, natural and historic objects, and wildlife in a park] can amount to an 'injury in fact' sufficient to lay the basis for standing . . . ."); *Lujan*, 504 U.S. at 562–63 ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."). But "courts must carefully distinguish between injury to the petitioner and injury to the environment." *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 537 (5th Cir. 2019). "The relevant showing for purposes of Article III standing . . . is not injury to the *environment* but injury to the *plaintiff*." *Laidlaw*, 528 U.S. at 181 (emphases added). "[G]eneralized harm to the . . . environment will not alone support standing, [but] if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).

The "particularized" requirement of an injury in fact also requires some unpacking in the environmental context. A "particularized" injury "affect[s] the plaintiff in a personal and

individual way." *Lujan*, 504 U.S. at 560 n.1. If the impact of the challenged activity on the plaintiff is "undifferentiated and common to all members of the public," his injury is not particularized. *United States v. Richardson*, 418 U.S. 166, 176–77 (1974) (internal marks omitted). Environmental harms frequently impact dozens, hundreds, even millions of people, thereby triggering "particularization" review. But this does *not* mean they automatically fail particularization. *See Sierra Club*, 405 U.S. 727 at 738 n.13 (collecting cases); *Spokeo*, 578 U.S. 330, 339 n.7 (2016). Instead, to establish standing, a plaintiff must be injured in a different way than society as a whole. *See Laidlaw*, 528 U.S. at 181–83 (plaintiffs who lived near polluted river and would use it for recreation established a particularized injury in fact). "In a[n environmental] suit, a typical way of demonstrating particularized injury is for a plaintiff to allege a sufficient geographical nexus to the site of the challenged project such that they can expect to suffer whatever environmental consequences the project may have." *Ondrusek v. U.S. Army Corps of Eng'rs*, 123 F.4th 720, 733 (5th Cir. 2024) (internal marks omitted). "[W]hen a challenged policy has broad, nationwide effects, courts must apply even more exacting scrutiny to ensure that the policy actually injures the plaintiff himself, rather than society as a whole." *Mass. Coal. for Immigr. Reform v. DHS*, 698 F. Supp. 3d 10, 23 (D.D.C. 2023) (internal marks omitted). "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Laidlaw* at 183 (internal marks omitted).

**1. Border Plaintiffs Adequately Alleged Injury in Fact (NEPA).**

The Border Plaintiffs are a married couple who live directly on the U.S.-Mexico border. ECF No. 26 at 3. In fact, a "temporary" fence was constructed in their backyard, in accordance

with the Secure Fence Act of 2006. ECF No. 26-3 at 3. As you can see in the image of the couple's backyard below, the border is a daily part of life for the Border Plaintiffs.



ECF No. 26-4 at 4 (notice the temporary border fence in the upper left corner of the photo).

Plaintiffs allege Chacon has been personally impacted by unlawful border crossers since the 1980s. ECF No. 26 at 25; *see also* ECF No. 26-3 at 1. Chavira has been impacted since he moved into Chacon's home after their marriage "a few years ago." ECF No. 26-4 at 2–3. While the temporary fence installed in 2008 (pictured above) "substantially reduce[d] the amount of foot traffic directly crossing [Chacon's] property," illegal border crossers can and do scale the fence and trespass on her property. ECF No. 26-3 at 1–2 ("[S]ometimes even pregnant women manage to cross it!"). These crossers allegedly leave trash in her yard and damage her property. ECF No. 26 at 26.

The Border Plaintiffs aver they are directly impacted by policies that impact the number of illegal border crossings because they live on the border. ECF No. 26-4 at 3 ("[O]ur daily environment significantly changes from policies that significantly increase border

crossing in way[s] that are not felt by the public at large."). They allege the Challenged Actions increased the number of people crossing their property. *Id.* at 5. As a result, there is more trash and noise from illegal crossers. *Id.* In fact, one summer during the Biden Administration, Chacon alleges border crossers leaped from the fence to her roof and broke the air conditioner. ECF No. 26-3 at 3. In addition to the cost of repairs, Chacon's sleep is often disrupted by illegal border crossers trespassing in her yard. *Id.* Illegal crossers even physically threatened Chavira. ECF No. 26-4 at 5.

The Border Plaintiffs clearly alleged a (1) concrete and particularized and (2) actual or imminent injury in fact. *See Laidlaw*, 528 U.S. at 180–81. Damage to real property is a classic example of a concrete injury for standing purposes. *See TransUnion*, 594 U.S. at 427 (a lawsuit alleging pollution damaged a plaintiff's property "may of course proceed in federal court because the plaintiff has suffered concrete harm to her property"). That is exactly what these Plaintiffs alleged—illegal border crossers damage their home. *See* ECF No. 26 at 26. These injuries are also particularized. The general public does not experience border crossers leaping from the temporary fence onto their roof the way the Border Plaintiffs do. *See Lujan*, 504 U.S. at 560 n.1. Finally, these alleged injuries are not "conjectural" or "hypothetical" injuries that may happen one day; they are both actual and imminent. *See* ECF No. 26-3 ("[The Challenged Actions] *have created* an environmental crisis right on my doorstep.") emphasis added)); *Lujan*, 504 U.S. at 560. This is sufficient to establish injury in fact. Indeed, the Government does not specifically contest the Border Plaintiffs suffered injury in fact. *See generally* ECF No. 27.

**2. Rodriguez Adequately Alleged Injury in Fact (ESA).**

Plaintiff Rodriguez is a resident of Euless, Texas who frequently travels across Texas. ECF No. 26 at 2, 28. One motivation for her travels is observing Texas wildlife, including

ESA endangered species. *Id.* at 28. For example, on one trip in the Rio Grande Valley, she spotted an endangered ocelot, and derived "aesthetic, spiritual, and recreational benefits." *Id.* She has also traveled to South Padre Island to see endangered loggerhead and green sea turtles, and similarly derived "aesthetic, spiritual, educational, and recreational benefits." *Id.* at 29. When Plaintiffs' Amended Complaint was filed, Rodriguez planned to visit the area where she previously saw an ocelot in Spring 2026 "with the exact date to be determined by the blooming [of wildflowers]." *Id.* at 28–29. She also planned to visit South Padre Island "with the hopes of seeing more [endangered sea turtles]" in February 2026. *Id.* at 29.

Plaintiff's alleged injury is procedural: failure to conduct ESA consultations in connection with the Challenged Actions. *See, e.g.,* ECF No. 26 at 32. As she alleges, "[a]n agency must initiate consultation under Section 7 whenever its action 'may affect' a listed species or critical habitat." *Id.* at 8 (citing 50 C.F.R. § 402.14(a)). Plaintiff alleges this obligation was triggered. *Id.* at 31–51. She says "population growth in Texas caused by the [Challenged Actions] and the disturbance to the natural environment caused by mass illegal border crossing leads to the loss and degradation of habitat" for the endangered green sea turtle and ocelot. *Id.* at 23.

Most relevant here, Justice Scalia famously stated the canonical test for injury in fact in ESA cases:

> Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing. But the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be [her]self among the injured.

*Lujan*, 504 U.S. at 562–63 (citations omitted). In that case, the Supreme Court found the Plaintiffs did not allege an imminent injury because they professed only a vague intent to visit places with endangered species. *Id.* at 564. "Such 'some day' intentions—without any

description of concrete plans, or indeed even any specification of *when* the someday will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Id.* On the other hand, specific plans to visit affected areas demonstrate injury in fact. *See Laidlaw*, 528 U.S. at 181–83.

Rodriguez satisfies the *Lujan/Laidlaw* requirement to allege an ESA injury in fact. She does not profess a "some day" intention to visit areas with potentially impacted endangered species—she alleges concrete plans to visit specific places. *See* ECF No. 26 at 29 (alleging plans to visit the Bracketville, Texas area in Spring 2026 and South Padre Island in February 2026).

The Government makes several arguments against injury in fact, but each is unpersuasive. First, the Government contends Rodriguez alleged only injury to the endangered species, not to herself. ECF No. 27 at 11. It is true that "[t]he relevant showing for purposes of Article III standing . . . is not injury to the *environment* but injury to *plaintiff*." *Laidlaw*, 528 U.S. at 181. But Rodriguez *has* alleged injury to herself—reduced opportunities to derive "aesthetic, spiritual, recreational, and educational benefits" from observing endangered species. ECF No. 26 at 29. Her injury, of course, requires *also* alleging injury to the endangered species she wishes to observe. That she did so does not mean she lacks standing—it means this is an environmental claim.

Next, the Government argues Rodriguez "has not shown a sufficient geographic nexus to any asserted environmental injury." ECF No. 27 at 12. In *Summers v. Earth Island Institute*, the Supreme Court explained that "to establish standing plaintiffs must show that they use the area affected by the challenged activity and not an area roughly in the vicinity." 555 U.S. at 499 (internal marks omitted). But here, Rodriguez alleges she uses and will use the areas where the endangered species are allegedly harmed, not areas near them. *See, e.g.*,

ECF No. 26 at 29 (endangered turtles are on South Padre Island, and she plans to visit the island in February 2026). The Government also argues Rodriguez's geographic allegations are too broad based on *Center for Biological Diversity v. EPA*. ECF No. 27 at 12. But in *Center for Biological Diversity,* the plaintiffs' allegations failed because they claimed water pollution damage to "Western and Central portions of the Gulf" but only claimed to use specific portions of the Gulf. 937 F.3d at 539. Thus, they "d[id] not provide nearly enough information to infer . . . that any discharges will geographically overlap with their interests." *Id.* Here, Plaintiff has alleged she used and will continue to use the specific areas where the endangered species are harmed. ECF No. 26 at 29. That is a sufficient geographic nexus. Accordingly, Rodriguez has sufficiently alleged injury in fact.

*B. The Border Plaintiffs and Rodriguez Adequately Alleged Causation.*

Causation means the plaintiff's injury is "fairly traceable to the challenged action of the defendant." *Laidlaw,* 528 U.S. at 180. It requires a plaintiff to allege "a causal connection between the injury and the conduct complained of." *Lujan,* 504 U.S. at 560. When the plaintiff is the object of the challenged government regulation, causation is easy to show. *Id.* at 561–62. But when, as here, the plaintiff's injury arises from the government's unlawful regulation of someone else, causation hinges on the response of third parties. *Id.* at 562. Such a causal chain does not preclude standing, but it does make it "substantially more difficult to establish." *Id.* (internal marks omitted). At the pleading stage, Plaintiffs must "clearly allege" facts sufficient to demonstrate each element of standing, including causation. *Spokeo,* 578 U.S. at 338.

Plaintiffs meet their burden at this stage. Plaintiffs here allege "the Biden Administration took actions to open the Nation's borders and expedited the flow of non-citizens into the United States." ECF No. 26 at 1. They allege the Challenged Actions led to

an increase in illegal crossings of the U.S.-Mexico border and contribute to population growth in Texas—and even provide some evidence. *See* ECF No. 26 at 12 (graph showing increase in U.S.-Mexico border encounters during Biden Administration); *id.* at 20 ("[I]nternational migration accounted for a quarter of Texas's new residents between 2021 and 2022, and nearly 57% from 2023 to 2024."). This surge, they allege, was a "predictable consequence of"—*i.e.*, caused by—the Challenged Actions. *Id.* at 13.

Next, Plaintiffs allege their interests are directly impacted by the increase in border crossers, population growth, or both. For instance, the Border Plaintiffs "directly experience[] the consequences of policies that increase unlawful border crossing." ECF No. 26 at 25. As to Rodriguez's interest in endangered species, plaintiffs allege "[t]hreatened and endangered species are adversely impacted, both by the direct impact of illegal border crossings and by the indirect population growth on habitat." ECF No. 26 at 22. So Plaintiffs' causation theory is as follows: the Biden Administration adopted policies intended to increase immigration, those policies led to an increase in illegal border crossers and population growth, and the Plaintiffs' interests were harmed by those policies.

To be sure, Plaintiffs' causation theory is a causal chain. It relies on the actions of third parties who are the object of the regulations—legal and illegal border crossers. This certainly raises Plaintiffs' burden, but it does not *preclude* standing. *See Lujan*, 504 U.S. at 561–62. And importantly, the standard here only requires Plaintiffs to "clearly allege" facts sufficient to demonstrate causation. *Spokeo*, 578 U.S. at 338. At this stage, the Court must "accept as true all material allegations of the complaint." *Seldin*, 422 U.S. at 501. This obligation might sometimes appear to be in tension with the instruction that "speculative" standing theories are insufficient to invoke the judicial power. *Osborn v. Visa Inc.*, 797 F.3d 1057, 1064 (D.C. Cir. 2015). The Court resolves this tension by considering whether the

Plaintiffs' allegations are susceptible to proof—whether they are the types of allegations that can be labeled "true" or "false." *Id.*

The Plaintiffs' allegations are susceptible to proof. At trial, they could prove the Challenged Actions increased illegal border crossings and contributed to population growth. They could further demonstrate through expert testimony or other competent evidence adverse impacts to their interests. The Border Plaintiffs, for instance, might testify to the damage illegal crossers caused at their home, or submit a receipt for repairs to their air conditioner. Rodriguez could demonstrate via expert testimony that illegal crossers or population growth further endangered protected species. Whether they will ultimately make those showings is not the question for today. Instead, the question is whether they *clearly alleged* causal facts susceptible to proof. *See Spokeo*, 578 U.S. at 338. They have.

The Government's challenges to causation are unpersuasive. First, they argue the Plaintiffs' causation theory is too speculative. ECF No. 27 at 11, 13, 16. In particular, they focus on Rodriguez's allegation that population increase and illegal border crossings harm the endangered species she wishes to observe. ECF No. 27 at 18–19. To be sure, the Supreme Court has cautioned that "plaintiffs attempting to show causation generally cannot rely on speculation about the unfettered choices made by independent actors not before the courts." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (internal marks omitted). But in that case—which was not at the pleading stage—the Supreme Court also noted plaintiffs can show standing if they show the "third parties will likely react in predictable ways that in turn will likely injure the plaintiffs." *Id.* (internal marks omitted). As described above, Plaintiffs alleged legal and illegal border crossers reacted in predictable ways to the Challenged Actions. Moreover, they alleged a causal theory susceptible to being proved or disproved. That is sufficient at this stage.

Next, the Government asserts there are no allegations the *specific* Challenged Actions caused Plaintiffs' harms. ECF No. 27 at 17. Here, they focus particularly on the Border Plaintiffs: "There are no allegations that these individuals—who purportedly have scaled fencing—entered the United States as a result of the [Challenged Actions] . . . ." ECF No. 27 at 19 (citations omitted). But the Government misstates the standard. When multiple actions contribute to a plaintiff's injury, the challenged action need only *contribute* to the injury to establish causation. *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 558 (5th Cir. 1996) (causation shown in a Clean Water Act case where defendant's discharge "contributes to the pollution");[6] *Gen. Land Off.*, 71 F.4th at 272 (causation shown where diverted funds would have reduced the number of illegal crossings, "even if they [would not have] fully stem[med] the tide"). Here, Plaintiffs plausibly alleged the Challenged Actions *contribute* to their injury. *See* ECF No. 26 at 11–12, 25–26. So causation is sufficiently shown.

Similarly, the Government alleges the Challenged Actions could not have *caused* the Border Plaintiffs' injuries because they acknowledge they suffered injuries from border crossers before the Biden Administration. ECF No. 27 at 19. But again, for the reasons just described, Plaintiffs burden was only to allege the Challenged Actions *contributed* to their injuries. They have done so.

*C. The Border Plaintiffs and Rodriguez Adequately Alleged Redressability.*

Finally, the Court considers redressability. The bar for redressability is lowered when plaintiffs assert procedural rights. "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards

---

[6] Defendants claim the Fifth Circuit in *Cedar Point* warned against "an overly broad application of this test." ECF No. 34 at 10. The overly broad application the Fifth Circuit was concerned about was an overly broad geographic application. *See Cedar Point*, 73 F.3d at 558 n.24 ("[S]ome 'waterways' covered by the [Clean Water Act] may be so large that plaintiffs should rightfully demonstrate a more specific geographic or other causative nexus in order to satisfy the 'fairly traceable' element of standing."). Here, where Plaintiffs allege damages in their own backyard, the warning is not relevant.

for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7. A procedural injury "is redressable by judicial review as long as there is some prospect that fixing the alleged procedural violation could cause the agency to change its position on the substantive action." *Ondrusek*, 123 F.4th at 734 (internal marks omitted). "It is enough for a plaintiff to show that there is a possibility that the procedural remedy will redress his injury." *Id.* (internal marks omitted).

The Plaintiffs here are asserting *procedural* rights—they challenge the Defendants' failure to prepare an EIS under NEPA and to conduct consultations under the ESA. They satisfy redressability at this stage because it is possible that an EIS requirement or an ESA consultation will cause the Defendant agencies to alter or mitigate their actions. In fact, requiring the agencies to consider environmental impacts *before* making decisions is the entire purpose of NEPA and the ESA. *See* ECF No. 26 at 6–9. The Plaintiffs specifically alleged their goal is to encourage Defendants to reconsider their actions in light of the environmental harms. *See, e.g.*, ECF No. 26-3 at 6–7 ("I believe that if the federal government had analyzed the environmental harms that would result before carrying out the [Challenged Actions], the environmental degradations that I have suffered might not have happened.").

Defendants cite a Fifth Circuit case to argue a NEPA analysis would not redress Plaintiffs' injuries because "NEPA is a procedural statute applicable *before* an agency decision." ECF No. 27 at 22 (citing *Harrison Cnty., Miss. v. United States Army Corps of Eng'rs*, 63 F.4th 458, 464 (5th Cir. 2023)). But *Harrison County* involved a NEPA challenge to a construction project completed *ninety years* before. 63 F.4th at 463–64. While Plaintiffs may not be able to use NEPA to challenge a completed project, they can of course challenge a final agency action if the program it implements is ongoing. *See Onderusk*, 123 F.4th 720.

Here, unlike *Harrison County*, the Challenged Actions are allegedly ongoing. *See* ECF No. 26 at 31–46. Thus, Plaintiffs can bring their NEPA claims.

Because the Plaintiffs sufficiently alleged injury in fact caused by the Government and redressable by this Court, they have standing to maintain their claims at this stage.

**CONCLUSION**

For the reasons above, Defendants' Original Motion to Dismiss (ECF No. 16) is **DENIED** as moot. Defendants' Motion to Dismiss (ECF No. 27) is **GRANTED in part** and **DENIED in part**. Counts Three, Seven, Eight, and Nine are **DISMISSED** entirely. Counts One, Two, Four, and Six may move forward entirely. Count Five is **DISMISSED** as to the TPS designations that were not in effect when this case was filed, but otherwise may proceed.

**SO ORDERED.**

August 7, 2026

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE